IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIED WORLD INSURANCE COMPANY, | : |
| Plaintiff, | : Civil Action No. |
| v. | : |
| KENNEY & MCCAFFERTY, P.C., BRIAN P. KENNEY, and LINDA J. STENGLE, | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Allied World Insurance Company ("Allied World"), for its Complaint, alleges as follows:

## NATURE OF THE ACTION

1.    Allied World files this action to obtain a judicial determination and declaration as to the parties' rights and obligations under *LPL Assure* Lawyers Professional Liability Policy No. 0306-8675, which Allied World issued to Kenney & McCafferty, P.C. (the "Firm") for the Policy Period of July 30, 2014 to July 30, 2015 (the "Policy"). A true and correct copy of the Policy, without the application, is attached hereto as Exhibit 1.

2.    Linda J. Stengle ("Stengle") has requested coverage under the Policy in connection with a **Claim** asserted against her by John Ferguson (the "Ferguson Claim").[1] The Firm and Brian P. Kenney ("Kenney") also have sought coverage under the Policy in connection with the Ferguson Claim and a related demand and lawsuit against them by Robert Madsen (the "Madsen Demand" or "Madsen Action").

---

[1] Terms in bold are bolded and defined in the Policy, to the extent not otherwise defined herein.

3. Allied World seeks a declaratory judgment that the Policy does not afford coverage for the Ferguson Claim for three separate and independently sufficient reasons:

- *First*, the Ferguson Claim does not arise out of a **Legal Services Wrongful Act** as required under the Policy's Insuring Agreement;

- *Second*, there is no coverage for the Ferguson Claim because Ferguson's complaint (the "Ferguson Complaint") alleges that before July 30, 2011 an **Insured** had a basis to believe that an **Insured** had breached a professional duty to Ferguson and had a basis to foresee that Ferguson or Madsen would assert a claim against the Firm, Kenney, and/or Stengle; therefore the Ferguson Claim does not meet a condition precedent to coverage (the "Prior Knowledge Condition"); and

- *Third*, the amounts sought in connection with the Ferguson Claim do not qualify as covered **Damages** under the Policy.

4. Allied World also seeks a declaratory judgment that the Policy does not afford coverage for the settlement with Ferguson that the Firm and Kenney made in or about February 2016.

5. Allied World also seeks a declaratory judgment that the Policy does not afford coverage for the Madsen Demand either because the Prior Knowledge Condition of the Insuring Agreement is not met; or because the Policy does not afford coverage for any amounts that Madsen seeks in the Madsen Demand that do not qualify as covered **Damages** under the Policy.

## PARTIES

6. Plaintiff Allied World is a corporation organized and existing under the laws of New Hampshire, with its principal place of business in New York, and is therefore a citizen of

New Hampshire and New York. Allied World legally transacts business in Pennsylvania and within the geographical jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

7. Defendant Kenney & McCafferty, P.C. is a professional corporation organized under the laws of, and having its principal place of business in, Pennsylvania, and therefore is a citizen of Pennsylvania.

8. Defendant Brian P. Kenney is a resident and citizen of Pennsylvania.

9. Defendant Linda J. Stengle is a resident and a citizen of Pennsylvania.

## JURISDICTION AND VENUE

10. This is a Complaint by Allied World pursuant to 28 U.S.C. §§ 2201 and 2202 for a declaratory judgment. An actual and justiciable controversy has arisen and currently exists between the parties relating to the parties' respective rights, duties and obligations under the Policy.

11. The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between Allied World and the Defendants. The amount in controversy exceeds $75,000, exclusive of interest and costs. Ferguson and Madsen each seek amounts exceeding $1,000,000.00 in connection with the Ferguson Claim and the Madsen Demand, respectively.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### The Ferguson Claim

13. John Ferguson ("Ferguson") is the plaintiff in a civil action now pending in the Montgomery County Court of Common Pleas, captioned *Ferguson v. Stengle*, Case No. 2018-

13985 (the "Ferguson Action"). The Ferguson Action was transferred from the Philadelphia Court of Common Pleas, where it was docketed under number 150302491. (A true and correct copy of the Complaint in the Ferguson Action, originally filed in the Philadelphia Court of Common Pleas, is attached hereto as Exhibit 2.)

14. The Ferguson Action arises out of whistleblower claims under the federal False Claims Act that Ferguson wished to pursue against financial institutions allegedly engaged in mortgage fraud.

15. In his Complaint, Ferguson alleges that he has over 25 years of experience as a real estate appraiser.

16. Ferguson alleges that on or about November 8, 2010, Ferguson contacted Stengle through a LinkedIn website dedicated to whistleblowers.

17. At the time, Stengle was an associate lawyer with the Firm.

18. Ferguson and Stengle allegedly agreed to use the False Claims Act to target financial institutions that purportedly were committing mortgage fraud.

19. Ferguson allegedly prepared a "roadmap" for Stengle at her request on how to pursue the financial institutions based on his insider information regarding the financial institutions' fraudulent scheme.

20. Ferguson alleges that on or about December 2, 2010, Stengle told Ferguson that clients with firsthand knowledge were needed to successfully bring litigation against the Bank of America ("BOA") and Countrywide Financial ("CF").

21. On or about December 27, 2010, Ferguson allegedly entered into a retainer agreement with the Firm (the "Retainer Agreement"). A copy of the alleged Retainer Agreement is appended as Exhibit C to the Ferguson Complaint.

22.     Ferguson alleges that, with Stengle's encouragement and participation, he worked to recruit potential clients.

23.     As a result of Ferguson's and Stengle's recruitment efforts, Robert Madsen ("Madsen") allegedly contacted Ferguson on March 21, 2011 about participating in whistleblower litigation against BOA and CF.

24.     Ferguson alleges that during a March 21, 2011 telephone call between Ferguson and Madsen, Ferguson allegedly advised Madsen of his attorney-client relationship with the Firm and Stengle, and offered to work with Madsen, the Firm and Stengle in return for being a co-relator in the False Claims Act litigation.

25.     On or about March 22, 2011, Stengle allegedly communicated with Madsen, agreed to represent him, and had him sign a retainer agreement to be represented by the Firm.

26.     Around this same time, Stengle and the Firm allegedly conspired with Madsen to "drop" Ferguson as a client and deprive him of his status as a co-relator in any litigation against BOA and CF.

27.     Ferguson alleges that on or about March 23, 2011, Stengle sent an email to Ferguson in which she said that Madsen was not willing to have Ferguson named as co-relator in the litigation against BOA and CF, "so we are going to have to work this in the form of you getting a percentage of my take on the case." This putative email is appended to the Ferguson Complaint as Exhibit F.

28.     Upon information and belief, on or about March 24, 2011 Ferguson told Stengle that he was unhappy about being excluded as a co-relator from any lawsuit against BOA and CF.

29.     Ferguson alleges that Stengle sent an email to Ferguson on March 28, 2011 that allegedly "confirmed to [Ferguson] that he would be receiving his share of relator fees out of any attorney fees generated as a result of the Qui Tam lawsuit involving" Madsen.

30.     Ferguson alleges that on or about June 21, 2011, Stengle, as counsel for Madsen, filed a complaint against BOA and CF in the United States District Court for the Southern District of New York (the "BOA/CF Action").

31.     Ferguson alleges that the BOA/CF Action was filed "as a result of information and background provided by both Ferguson and Madsen."

32.     Ferguson alleges that after the BOA/CF Action was filed, he had numerous conversations with Stengle "regarding his compensation from" the BOA/CF Action, that Stengle "continuously reassured" Ferguson "that their agreement was binding," and that Ferguson allegedly "relied on the fact that he was either being represented as a co-relator or going to be compensated as one" by Stengle or the Firm "in all false claim matters in which he had provided information and obtained other resources" for the attorneys, including Stengle, who are named defendants in the Ferguson Action.

33.     On or about October 18, 2011, Stengle allegedly advised Ferguson that she was leaving her employment with the Firm.

34.     Ferguson alleges that Stengle continued to represent him after leaving the Firm.

35.     Ferguson alleges that during the next year Stengle allegedly intentionally ignored communications from Ferguson.

36.     Ferguson alleges that on or about November 15, 2012, Stengle allegedly falsely represented to Ferguson that the BOA/CF Action was not active and that there was no recovery.

37.     The U.S. Department of Justice allegedly settled the BOA/CF Action.

38.     Ferguson alleges that Madsen, as a relator, recovered $56 million in the settlement with BOA.

39.     In December 2014, news reports indicated that Madsen was one of four whistleblowers in the federal government's $17 billion civil settlement with BOA, and that Madsen received a $56 million or $58 million payment for his role as relator.

40.     Ferguson alleges that the attorneys representing Madsen received a payment of approximately $19 million in attorney's fees.

41.     Ferguson alleges that he is entitled to a share of Madsen's award in the amount of $28 million, but has not received the payment that he is allegedly owed.

42.     On or about March 20, 2015, Ferguson filed a Praecipe to Issue Writ of Summons in Pennsylvania state court naming as defendants Stengle and her individual law practices, Stengle Law and The Arras Group, Inc.; the Firm; Firm attorney Brian P. Kenney ("Kenney"); and Madsen.

43.     The Firm and Kenney settled with Ferguson in February 2016.

44.     On February 8, 2016, Ferguson filed his Complaint in the Philadelphia Court of Common Pleas, March Term 2015, No. 2491, naming as defendants Stengle; Stengle Law; The Arras Law Group, Inc.; and Madsen.

45.     Upon information and belief, the Ferguson Action, which was later transferred to the Montgomery County Court of Common Pleas, is still pending and the pleadings recently closed.

**The Madsen Action and Demand**

46.     On November 8, 2016, Madsen filed a Praecipe to Issue Writ of Summons against the Firm and Kenney (the "Madsen Praecipe") in the Montgomery County Court of Common

Pleas, Case No. 2016-26797 (the "Madsen Action"). (A true and correct copy of the Madsen Praecipe is attached to this Complaint as Exhibit 3.) To date, Madsen has not filed a complaint in the Madsen Action.

47. Before filing the Madsen Praecipe, counsel for Madsen sent a letter to the Firm and Kenney on or about March 8, 2016. In the letter, Madsen asserted that the Firm and Kenney had breached their duties, as his legal counsel, with respect to Ferguson's putative claims concerning the BOA/CF Action.

**The Policy**

48. Allied World issued the Policy to the Firm for the **Policy Period** of July 30, 2014 to July 30, 2015. (Ex. 1, Declarations.)

49. Subject to all of its terms, conditions, limits and exclusions, the Policy provides that Allied World will pay on behalf of an **Insured** amounts that:

> an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out of any of the following **Wrongful Acts** by an **Insured** first made during the **Policy Period** or any Extended Reporting Period:
>
> A. **Legal Services Wrongful Act**
>
> B. **Privacy Wrongful Act**
>
> C. **Network Security Wrongful Act**

(Ex. 1, Insuring Agreement, Section I.)

50. The Policy defines a **Legal Services Wrongful Act** as:

> 1. any actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**; or
>
> 2. any actual or alleged **Personal Injury** committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**.

(Ex. 1, Definitions, Section III.Q.)

51. The Policy defines **Legal Services**, in relevant part, as:

> those services performed on behalf of the **Named Insured** for others by an **Insured**, whether or not performed for a fee or other consideration, as a licensed lawyer in good standing . . . , but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer.

(Ex. 1, Definitions, Section III.P.)

52. The Policy's Insuring Agreement provides that:

> It is a condition precedent to coverage under this Policy that any **Wrongful Act** upon which a **Claim** is based occurred:
>
> 1. during the **Policy Period**; or
>
> 2. on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:
>
> . . .
>
>> (b) prior to July 30, 2011 no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**[.]

(Ex. 1, Insuring Agreement, Section I, as amended by Endorsement 2 (the "Prior Knowledge Condition").)

53. The Policy's definition of an **Insured** includes "any lawyer . . . who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** or **Predecessor Firm**."

54. The Policy states that **Damages** do not include "amounts deemed uninsurable by law" or "the return or restitution of legal fees, costs and expenses, no matter how claimed[.]"

(Ex. 1, Definitions, Section III.G, as amended by Endorsement 1.)

55.     The Policy provides that Allied World "shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy.  The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**."  (Ex. 1, Conditions, Section V.C.)

56.     The Policy further provides that Allied World "shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into a settlement of any **Claim** that the **Insurer** deems appropriate."  (Id.)

**The Coverage Claim**

57.     On or about February 18, 2015, the Firm first provided notice to Allied World of a potential claim by Ferguson.

58.     Allied World agreed to defend the Firm, Kenney, and Stengle with respect to the Ferguson Demand subject to a full reservation of Allied World's rights.

59.     After Ferguson filed his Complaint in the Ferguson Action, Ferguson settled with the Firm and Kenney.

60.     Allied World did not consent to the settlement.

61.     Allied World has continued to contribute to Stengle's defense, together with another insurer, subject to a full reservation of Allied World's rights.

62.     On March 10, 2016, counsel for the Firm and Kenney notified Allied World of the Madsen Demand.

63.     On March 21, 2016, Allied World agreed to provide the Firm and Kenney with a defense of the Madsen Demand, subject to a full reservation of Allied World's rights.

## COUNT I
### Declaration of No Coverage for the Ferguson Claim
### Because the Claim Does Not Arise Out of a Legal Services Wrongful Act

64. Allied World realleges and incorporates by reference the allegations in Paragraphs 1 through 63 as if fully set forth herein in Count I.

65. As set forth above, the Policy affords coverage, in relevant part, for **Claims** arising out of a **Legal Services Wrongful Act**, which is further defined as an "actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**[.]" Ex. 1, Insuring Agreement, Section I; Definitions, Section III.Q.

66. The Ferguson Action arises out of an alleged business transaction in which Stengle allegedly agreed to share her attorneys' fees with Ferguson but then breached that agreement by failing to pay Ferguson his share of Stengle's fee recovery in the BOA/CF Action.

67. These alleged acts – which amount to a breach of contract with a business partner – do not qualify as "services performed in the ordinary course of the **Insured's** activities as a lawyer," and thus do not qualify as **Legal Services** under the Policy.

68. Accordingly, the Ferguson Action does not arise out of a **Legal Services Wrongful Act**, because it does not arise out of an actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services.**

69. The Ferguson Action therefore does not fall within the scope of the Policy's Insuring Agreement, and Allied World is entitled to a determination that there is no coverage under the Policy for the Ferguson Claim.

## COUNT II
### Declaration of No Coverage Because the Ferguson Action and Madsen Demand
### Do Not Meet the Policy's Prior Knowledge Condition

70. Allied World realleges and incorporates by reference the allegations in Paragraphs 1 through 69 as if fully set forth herein in Count II.

71.     As explained above, it is a condition precedent to coverage that:

prior to July 30, 2011 no **Insured** had any basis (1) to believe that any
**Insured** had breached a professional duty; or (2) to foresee that any fact,
circumstance, situation, transaction, event or **Wrongful Act** might
reasonably be expected to be the basis of a **Claim** against any **Insured**[.]

(Ex. 1, Insuring Agreement, Section I, as amended by Endorsement 2.)

72.     Ferguson alleges that Stengle breached her professional duties to Ferguson and/or

Madsen before July 30, 2011, while she was employed by the Firm, in the following ways:

a)      Although Ferguson had retained the Firm to represent him with respect to

all False Claim Act claims against financial institutions, Stengle agreed to

represent Madsen in the BOA/CF Action and exclude Ferguson as a

relator;

b)      Stengle promised to share a contingent attorneys' fee award in the

BOA/CF Action with Ferguson, who is not an attorney.

73.     Ferguson also alleges that Stengle knew on or about March 24, 2011 that

Ferguson was displeased that he would not be a named plaintiff in the BOA/CF lawsuit and

expected to be compensated for any recovery achieved in the action.

74.     At the time of these alleged breaches, Stengle was employed by the Firm to

perform **Legal Services** on behalf of the Firm.

75.     Before July 30, 2011, Stengle, an **Insured**, had a basis to believe that she had

breached a professional duty and/or to foresee that a fact, circumstance, situation, transaction,

event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against them.

76.     The Madsen Demand constitutes a **Related Claim** under Section V.E.5 of the

Policy because it is based upon or arises out of the same **Wrongful Act** or **Related Act or**

**Omission** as alleged in the Ferguson Action.  Madsen alleges that the Firm and Kenney breached

their professional obligations to him with respect to Ferguson's putative claims concerning the BOA/CF Action.

77.     Accordingly, Allied World is entitled to a determination that there is no coverage under the Policy for the Ferguson Claim or the Madsen Demand because an **Insured** had a basis to believe, before July 30, 2011, that an **Insured** had breached a professional duty and/or to foresee that the events alleged in Ferguson's Complaint might reasonably be expected to be the basis of a **Claim** against an **Insured**.

## COUNT III
### Declaration of No Coverage for the Ferguson Claim or the Madsen Demand for Amounts Sought that Do Not Qualify as Covered Damages under the Policy

78.     Allied World realleges and incorporates by reference the allegations in Paragraphs 1 through 77 as if fully set forth herein in Count III.

79.     As noted above, the Policy's definition of **Damages** expressly excludes "amounts deemed uninsurable by law" as well as "the return or restitution of legal fees, costs and expenses, no matter how claimed[.]" (Ex. 1, Definitions, Section III.G, as amended by Endorsement 1.)

80.     In the Ferguson Action, Ferguson seeks to recover a portion of the attorneys' fee received by Stengle as a result of the settlement of the BOA/CF Action.

81.     Upon information and belief, Madsen demands that the Firm and Kenney indemnify him against any recovery that Ferguson may obtain from Madsen in the Ferguson Action and that the Firm and Kenney repay Madsen all or part of the attorneys' fees that he paid the Firm.

82.     Accordingly, Allied World is entitled to a determination that there is no coverage under the Policy for the Ferguson Action or the Madsen Demand to the extent that the relief sought in connection therewith does not qualify as covered **Damages** under the Policy.

## COUNT IV
### Declaration of No Coverage for the Ferguson Settlement
### Because the Firm and Kenney Did Not Have the Consent of Allied World

83. Allied World realleges and incorporates by reference the allegations in Paragraphs 1 through 82 as if fully set forth herein in Count IV.

84. As noted above, the Policy provides that Allied World "shall have the right to investigate and conduct negotiations and, with the **Insured**'s consent, which shall not be unreasonably withheld, enter into a settlement of any **Claim** that the **Insurer** deems appropriate." (Ex. 1, Conditions, Section V.C.)

85. In February 2016, after the Ferguson Action was filed, the Firm and Kenney settled with Ferguson on confidential terms.

86. Allied World did not consent to the settlement.

87. The settlement was not reasonable.

88. The Firm and Kenney have asserted that Allied World should have consented to the settlement.

89. Accordingly, Allied World is entitled to a determination that there is no coverage under the Policy for Ferguson's settlement with the Firm and Kenney.

WHEREFORE, for the reasons set forth above, Allied World respectfully requests that the Court enter a judgment in its favor:

A. Determining that, for the reasons set forth in Count I, the Policy does not afford coverage for any **Insured** in connection with the Ferguson Claim because it does not arise out of a **Legal Services Wrongful Act**;

B. Determining that, for the reasons set forth in Count II, the Policy does not afford coverage for any **Insured** because the Ferguson Claim and the Madsen Demand

do not meet the Prior Knowledge Condition of the Policy's Insuring Agreement, which is a condition precedent to coverage;

C. Determining that, for the reasons set forth in Count III, the Policy does not afford coverage for any **Insured** in connection with the Ferguson Claim or the Madsen Demand for any amounts sought that do not constitute covered **Damages** under the Policy;

D. Determining that, for the reasons set forth in Count IV, the Policy does not afford coverage for the settlement between Ferguson and the Firm and Kenney because Allied World did not consent to the settlement; and

E. Awarding Allied World such additional declaratory and other relief as shall be found to be appropriate under the circumstances.

Dated: January 27, 2020

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

By: _____

Ronald P. Schiller
Sharon F. McKee
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6200
(215) 568-0300 facsimile
rschiller@hangley.com
smckee@hangley.com

*Attorneys for Allied World Insurance Company*

JS 44 (Rev 02/19)

# CIVIL COVER SHEET

20-CV-469

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
ALLIED WORLD INSURANCE COMPANY

## DEFENDANTS
KENNEY & McCAFFERTY, P C , BRIAN P KENNEY, and LINDA J STENGLE

**(b)** County of Residence of First Listed Plaintiff    New Hampshire
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Montgomery
*(IN U S PLAINTIFF CASES ONLY)*

NOTE    IN LAND CONDEMNATION CASES USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Hangley Aronchick Segal Pulin & Schiller
One Logan Square, 27th Fl, Philadelphia, PA 19103
T 215 568 6200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U S Government Plaintiff
- ❏ 3  Federal Question *(U S Government Not a Party)*
- ❏ 2  U S Government Defendant
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*    Click here for Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance<br>❏ 120 Marine<br>❏ 130 Miller Act<br>❏ 140 Negotiable Instrument<br>❏ 150 Recovery of Overpayment & Enforcement of Judgment<br>❏ 151 Medicare Act<br>❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>❏ 153 Recovery of Overpayment of Veteran's Benefits<br>❏ 160 Stockholders' Suits<br>❏ 190 Other Contract<br>❏ 195 Contract Product Liability<br>❏ 196 Franchise | **PERSONAL INJURY**<br>❏ 310 Airplane<br>❏ 315 Airplane Product Liability<br>❏ 320 Assault, Libel & Slander<br>❏ 330 Federal Employers' Liability<br>❏ 340 Marine<br>❏ 345 Marine Product Liability<br>❏ 350 Motor Vehicle<br>❏ 355 Motor Vehicle Product Liability<br>❏ 360 Other Personal Injury<br>❏ 362 Personal Injury - Medical Malpractice | ❏ 625 Drug Related Seizure of Property 21 USC 881<br>❏ 690 Other | ❏ 422 Appeal 28 USC 158<br>❏ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>❏ 820 Copyrights<br>❏ 830 Patent<br>❏ 835 Patent - Abbreviated New Drug Application<br>❏ 840 Trademark | ❏ 375 False Claims Act<br>❏ 376 Qui Tam (31 USC 3729(a))<br>❏ 400 State Reapportionment<br>❏ 410 Antitrust<br>❏ 430 Banks and Banking<br>❏ 450 Commerce<br>❏ 460 Deportation<br>❏ 470 Racketeer Influenced and Corrupt Organizations<br>❏ 480 Consumer Credit<br>❏ 485 Telephone Consumer Protection Act<br>❏ 490 Cable/Sat TV<br>❏ 850 Securities/Commodities/ Exchange |
|  | **PERSONAL INJURY**<br>❏ 365 Personal Injury Product Liability<br>❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>❏ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>❏ 370 Other Fraud<br>❏ 371 Truth in Lending<br>❏ 380 Other Personal Property Damage<br>❏ 385 Property Damage Product Liability | **LABOR**<br>❏ 710 Fair Labor Standards Act<br>❏ 720 Labor/Management Relations<br>❏ 740 Railway Labor Act<br>❏ 751 Family and Medical Leave Act<br>❏ 790 Other Labor Litigation<br>❏ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>❏ 861 HIA (1395ff)<br>❏ 862 Black Lung (923)<br>❏ 863 DIWC/DIWW (405(g))<br>❏ 864 SSID Title XVI<br>❏ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>❏ 870 Taxes (U S Plaintiff or Defendant)<br>❏ 871 IRS - Third Party 26 USC 7609 | ❏ 890 Other Statutory Actions<br>❏ 891 Agricultural Acts<br>❏ 893 Environmental Matters<br>❏ 895 Freedom of Information Act<br>❏ 896 Arbitration<br>❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>❏ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>❏ 210 Land Condemnation<br>❏ 220 Foreclosure<br>❏ 230 Rent Lease & Ejectment<br>❏ 240 Torts to Land<br>❏ 245 Tort Product Liability<br>❏ 290 All Other Real Property | **CIVIL RIGHTS**<br>❏ 440 Other Civil Rights<br>❏ 441 Voting<br>❏ 442 Employment<br>❏ 443 Housing/ Accommodations<br>❏ 445 Amer w/Disabilities - Employment<br>❏ 446 Amer w/Disabilities - Other<br>❏ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>❏ 463 Alien Detainee<br>❏ 510 Motions to Vacate Sentence<br>❏ 530 General<br>❏ 535 Death Penalty<br>**Other:**<br>❏ 540 Mandamus & Other<br>❏ 550 Civil Rights<br>❏ 555 Prison Condition<br>❏ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>❏ 462 Naturalization Application<br>❏ 465 Other Immigration Actions |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U S Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
28 U S C §§ 2201 and 2202
Brief description of cause
Declaratory judgment action seeking a declaration of the insurer's rights and duties

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND.    ❏ Yes    ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE                    DOCKET NUMBER

DATE
01/27/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG JUDGE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

**20    4691**

Address of Plaintiff: _____ 1690 New Britain Avenue, Suite 101, Farmington, CT 06032

Address of Defendant: _____ 1787 Sentry Parkway West, Building 18, Suite 410, Blue Bell, PA 19422

Place of Accident, Incident or Transaction: _____ Montgomery County, PA

---

**RELATED CASE, IF ANY:**

Case Number _____ Judge _____ Date Terminated _____

Civil cases are deemed related when *Yes* is answered to any of the following questions

| | | | |
|---|---|---|---|
| 1 | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☑ |
| 2 | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☑ |
| 3 | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☑ |
| 4 | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☑ |

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 01/27/2020 _____                         41357

*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I D # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.   Federal Question Cases:**

- ☐ 1 Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2 FELA
- ☐ 3 Jones Act-Personal Injury
- ☐ 4 Antitrust
- ☐ 5 Patent
- ☐ 6 Labor-Management Relations
- ☐ 7 Civil Rights
- ☐ 8 Habeas Corpus
- ☐ 9 Securities Act(s) Cases
- ☐ 10 Social Security Review Cases
- ☐ 11 All other Federal Question Cases
  *(Please specify)* _____

**B.   Diversity Jurisdiction Cases:**

- ☑ 1 Insurance Contract and Other Contracts
- ☐ 2 Airplane Personal Injury
- ☐ 3 Assault, Defamation
- ☐ 4 Marine Personal Injury
- ☐ 5 Motor Vehicle Personal Injury
- ☐ 6 Other Personal Injury *(Please specify)* _____
- ☐ 7 Products Liability
- ☐ 8 Products Liability – Asbestos
- ☐ 9 All other Diversity Cases
  *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration )*

I, _____ Ronald P. Schiller _____, counsel of record or pro se plaintiff, do hereby certify

☐ Pursuant to Local Civil Rule 53 2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 00 exclusive of interest and costs

☑ Relief other than monetary damages is sought

**JAN 27 2020**

DATE 01/27/2020 _____                         41357

*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I D # (if applicable)*

NOTE  A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

Civ 609 (5 2018)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| ALLIED WORLD INSURANCE COMPANY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| KENNEY & MCCAFFERTY, P.C., | : | NO. **20    469** |
| BRIAN P. KENNEY, and LINDA J. STENGLE, | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus -- Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos -- Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management - Cases that do not fall into any one of the other tracks.    (X)

| | | |
|---|---|---|
| 01/27/2020 | Ronald P. Schiller | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215 568 6200 | 215 568 0300 | rschiller@hangley.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JAN 27 2020

# EXHIBIT 1



# Allied World
# Lawyers Professional Liability

**Dear Policyholder,**

Thank you for choosing Allied World as your Lawyers Professional Liability insurance carrier. Attached is your Allied World LPL Assure Policy. We are proud to be rated A (Excellent) XV by AM Best. In addition to the coverage provided in the attached policy, Allied World partners with the law firm of Hinshaw & Culbertson LLP to provide the following value added risk management services at *no additional charge.*

Allied World Lawyers Professional Liability policyholders can access the interactive risk management website at:

www.awac.lawyeringlaw.com

Login id: **awaclpl**

Password: **insure**

## CONTINUING LEGAL EDUCATION (CLE)

- Up to 3 hours free CLE for each Insured Attorney
- You may access the free CLE courses by contacting **cle@hinshawlaw.com**
- CLE options include up to 50 CLE webcast programs
- In addition to free CLE programs, insureds can access fee-based Hinshaw CLE programs as well. To access fee-based CLE programs offered through the West LegalEd Center, please go to **www.awac.lawyeringlaw.com**

## RISK MANAGEMENT WEBSITE

This interactive website contains the following information, documents, and forms.

- Articles on topics related to legal malpractice
- Sample engagement agreements, non-engagement & disengagement letters, litigation hold letters and more
- Checklists to assist in client screening, opening new files, conflicts checks, and suing clients for fees
- Summaries of recent and archived decisions concerning lawyers' professional liability
- Considerations for adopting law firm policies on issues such as records retention, disaster planning, etc.
- Rules of professional conduct & ethics opinions
- Self-audit forms to help evaluate practice management systems

## RISK MANAGEMENT CONSULTATIONS

- ***Up to two hours free per year, per firm*** of live risk management hotline support with an experienced senior attorney from the law firm of Hinshaw & Culbertson LLP
- Hotline partners have years of experience specializing in professional liability and legal ethics
- All hotline consultations form an attorney-client privileged relationship

For a risk management consultation, call **866-639-2309** and identify yourself as a lawyer insured by Allied World. You can also request a consultation by going to the Risk Management Consultation link on **www.awac.lawyeringlaw.com.**

## NEWSLETTERS AND EMAIL ALERTS

- The Hinshaw & Culbertson LLP *"Lawyers' Lawyer"* Newsletter is published approximately six times per year and contains reports of recent developments in a format that identifies the risk management issue presented, describes the new case or opinion, and explains the risk management implications and lessons of the case or opinion
- Hinshaw can also issue weekly email "Client Alerts" which notify lawyers of recent decisions involving issues pertaining to practice management, legal ethics and professional liability

If you are not receiving these publications via email, please contact **riskmanagement@awacservices.com.**

## CONTACTS

If you have any questions on these risk management services, please contact:

**Kristen Lambert**
Vice President Risk Management
**AWAC Services** Company,
a member of **Allied World**
**E.** kristen.lambert@awacservices.com
**T.** 857.288.6036

**Thank you for choosing Allied World.**



**www.alliedworldinsurance.com**

Coverage is underwritten by an insurance subsidiary of Allied World Assurance Company Holdings, AG ("Allied World"). Such subsidiaries currently carry an A.M. Best rating of "A (Excellent)." Coverage is only offered through licensed agents and brokers. Actual coverage may vary and is subject to policy language as issued. Risk Management services are provided or arranged through AWAC Services Company, a member company of Allied World. © Allied World Assurance Company Holdings, AG. All rights reserved. August 2013



**ALLIED WORLD INSURANCE COMPANY**
**1690 New Britain Avenue, Suite 101, Farmington, CT 06032**
**Tel. (860) 284-1300 Fax (860) 284-1301**

---

## ALLIED WORLD *LPL ASSURE*
## LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

**POLICY NUMBER: 0306-8675**      **RENEWAL OF:  0306-8675**

---

THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD, AND REPORTED IN ACCORDANCE WITH SECTION V.E. OF THE POLICY.  THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES WILL BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES AND CLAIMS EXPENSES WILL BE APPLIED AGAINST THE RETENTION AMOUNT.    IN NO EVENT WILL THE INSURER BE LIABLE FOR CLAIMS EXPENSES OR DAMAGES IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY.

---

## DECLARATIONS

**Item 1.  Name and Mailing Address of Named Insured:**

> Kenney & McCafferty, P.C.
> 1787 Sentry Parkway West, Building 18,
> Suite 410
> Blue Bell, PA 19422

**Item 2.  Policy Period:**

> (a) Inception Date:    July 30, 2014
> (b) Expiration Date:   July 30, 2015
>
> **At 12:01 a.m. Standard Time at the Mailing Address Shown Above**

**Item 3.  Limits of Liability:**

> **I.    Limits of Liability for Insuring Agreements**
>
> > (a)    $4,000,000  Limit of Liability for each and every Claim under Insuring Agreement I.
> >
> > (b)    $4,000,000  Limit of Liability for all Claims under Insuring Agreement I.
>
> **II.    Limits of Liability for Additional Coverages**
>
> > (a)    $25,000  Shared Aggregate Limit of Liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage.
> >
> > (b)    $500,000   Limit of Liability for each and every Claim under Additional

Coverage B., Non-Profit Directors & Officers Coverage.

$500,000  Limit of Liability for all Claims under Additional Coverage B., Non-Profit Directors & Officers Coverage.

(c)     $30,000 Limit of Liability for all personal earnings, under Additional Coverage C.; provided that this Limit of Liability is further limited as follows:

(i)     $500 for personal earnings lost each day

(ii)    $15,000 for personal earnings per Claim

(d)     $20,000 Limit of Liability for all fees, costs and expenses incurred from each and every Disciplinary Proceeding under Additional Coverage D.

$60,000 Limit of Liability for all fees, costs and expenses incurred from all Disciplinary Proceedings under Additional Coverage D.

(e)     $5,000 Limit of Liability for all fees and costs incurred from the Insured receiving a Subpoena arising out of Legal Services under Additional Coverage E.

**III.    Policy Aggregate Limit of Liability**

(a)     $4,000,000 Aggregate Limit of Liability for all amounts payable under Insuring Agreement I. and Additional Coverages A. and B.  The Aggregate Limit of Liability does not apply to the Additional Coverages C., D. and E.

**Item 4.        Retentions:**

(a)   $25,000  each and every Claim under Insuring Agreement I.

(b)   $5,000   each and every Material Event; each and every Privacy Wrongful Act; and each and every Data Breach under Additional Coverage A.

(c)   $25,000   each and every Claim under Additional Coverage B.

No Retention shall apply to Additional Coverages C., D. and E.

**Item 5.   Address of Insurer For Notices Under This Policy:**

Claim-Related Notices:
noticeofloss@awac.com

All Other Notices:
1690 New Britain Avenue Farmington, CT 06032

**Item 6.    Premium:**
Total Premium: **$36,297**

**Item 7.  Retroactive Date:**          August 18, 2004


**Item 8.   Endorsements Attached at Issuance:**
1. LPL 00032 37 (11/2013) Pennsylvania Amendatory
2. LPL 00096 00 (11/2013) Prior Knowledge Date


In Witness Whereof, the **Insurer** has caused this Policy to be executed and attested. This Policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.


President                                Asst. Secretary


**AUTHORIZED REPRESENTATIVE**

# ENDORSEMENT NO. 1

## PENNSYLVANIA STATE AMENDATORY

This Endorsement, effective at 12:01 a.m. on July 30, 2014, forms part of

| | |
|---|---|
| Policy No. | 0306-8675 |
| Issued to | Kenney & McCafferty, P.C. |
| Issued by | Allied World Insurance Company |

To be attached to and form a part of all Lawyers Professional Liability Policies written in the State of Pennsylvania.

In consideration of the premium charged, it is understood and agreed that:

1.  Section III. DEFINITIONS, Subsection G., the definition of "**Damages**" is amended to read as follows:

    G.  **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest.

        **Damages** shall not include:

        1.  criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

        2.  punitive, exemplary or the multiplied portion of multiple damages;

        3.  amounts deemed uninsurable by law;

        4.  the return or restitution of legal fees, costs and expenses, no matter how claimed;

        5.  amounts paid or incurred by an **Insured** to comply with a judgment or settlement for any form of equitable or non-monetary relief; or

        6.  amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

2.  Section V. CONDITIONS, Subsection A.5. is amended to read as follows:

    5.  Exhaustion of Limit of Liability

        The **Insurer** shall not be obligated to pay any **Damages**, **Claim Expenses** or any other amounts payable under this Policy or to defend or continue to defend any **Claim** after the Limit of Liability set forth in Item 3.III.(a) has been exhausted; provided however this provision shall not apply to pre-judgment interest which shall be paid in addition to the Limit of Liability. In such case, the **Insurer** shall have the right to withdraw from the further investigation or defense of any pending **Claim** by tendering control of such investigation or defense to the **Named Insured** and the **Named Insured** agrees, as a condition to the issuance of this Policy, to accept such tender and proceed solely at its

own cost and expense.

3. Section V. CONDITIONS, Subsection C.3. is amended to read as follows:

3. The **Insurer** shall not be obligated to pay any **Damages** or **Claim Expenses**, or to defend or continue to defend any **Claim** after the applicable Limit of Liability has been exhausted; provided however this provision shall not apply to pre-judgment interest which shall be paid in addition to the Limit of Liability. If the **Insurer's** Policy Aggregate Limit of Liability as set forth in Item 3.III.(a) of the Declarations is exhausted by the payment of **Damages** and **Claim Expenses**, the entire premium will be deemed fully earned.

4. Section V. CONDITIONS, Subsection J. CANCELLATION; NO OBLIGATION TO RENEW, is amended to read as follows:

J. **CANCELLATION; NO OBLIGATION TO RENEW**

1. This Policy shall terminate upon the Expiration Date set forth in Item 2. of the Declarations, or upon any earlier cancellation.

2. This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect. If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

3. This Policy may be canceled by the **Insurer** by delivering or mailing written notice to the **Named Insured**, at its last known address, at least sixty (60) days prior to the effective date of such cancellation, for the following reasons:

(a) a condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the **Policy Period**;

(b) loss of reinsurance or a substantial decrease in reinsurance, which loss or decrease shall, at the time of cancellation, be certified to the Insurance Commissioner of Pennsylvania as directly affecting in-force policies;

(c) the Policy was obtained through fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by the **Insurer**;

(d) material failure to comply with the policy terms, conditions or contractual duties;

(e) any other reason that the Insurance Commissioner of Pennsylvania may approve.

Such notice shall include the reason(s) for cancellation and shall also state that, at the **Named Insured's** written request, the **Insurer** shall provide loss information to the **Named Insured**. The **Named Insured's** written request must be made within ten (10) days from the **Named Insured's** receipt of notice.

4. This Policy may be canceled by the **Insurer** by delivering or mailing written notice to the **Named Insured**, at its last known address, at least fifteen (15) days prior to the effective date of such cancellation, for the following reasons:

<ul>
<li>(a) the **Insured** has made a material misrepresentation which affects the insurability of the risk; or</li>
<li>(b) the **Insured** failed to pay a premium when due.</li>
</ul>

Such notice shall include the reason(s) for cancellation and shall also state that, at the **Named Insured's** written request, the **Insurer** shall provide loss information to the **Named Insured**. The **Named Insured's** written request must be made within ten (10) days from the **Named Insured's** receipt of notice.

5. If the Policy is canceled by the **Insurer**, the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

6. The **Insurer** will not be required to renew this Policy upon its expiration. If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail by first-class or certified mail written notice, to the **Named Insured**, at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2. of the Declarations. Such notice shall state the specific reason(s) for non-renewal.

7. If the **Insurer** increases the premium upon renewal, the **Insurer** will deliver or mail to the **Named Insured**, at its last known address, written notice to that effect at least thirty (30) days before the Expiration Date set forth in Item 2. of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT NO. 2**

**PRIOR KNOWLEDGE DATE**

This Endorsement, effective at 12:01 a.m. on July 30, 2014, forms part of

|            |                                 |
|------------|---------------------------------|
| Policy No. | 0306-8675                       |
| Issued to  | Kenney & McCafferty, P.C.       |
| Issued by  | Allied World Insurance Company  |

In consideration of the premium charged, it hereby agreed that Section I. INSURING AGREEMENT, Subsection 2.(b) is hereby deleted and replaced with the following:

(b)     prior to July 30, 2011 no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative



**ALLIED WORLD INSURANCE COMPANY**
**1690 New Britain Avenue, Suite 101, Farmington, CT 06032**

<span style="color:#8B0000">**ALLIED WORLD *LPL ASSURE***
**LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY**</span>

## TABLE OF CONTENTS

**I. INSURING AGREEMENT** ......................................................................................................... 1
    Legal Services Wrongful Act Coverage ................................................................................ 1
    Privacy Wrongful Act Coverage .......................................................................................... 1
    Network Security Wrongful Act Coverage ........................................................................... 1

**II. ADDITIONAL COVERAGES** ................................................................................................ 2
    Supplemental Privacy Coverage .......................................................................................... 2
        Crisis Management Coverage ......................................................................................... 2
        Notification and Credit Monitoring Coverage ............................................................... 2
        Data Forensics Coverage ............................................................................................... 3
    Non-Profit Director and Officer Coverage ........................................................................... 3
    Lost Earnings Coverage ....................................................................................................... 4
    Disciplinary Proceedings Coverage ..................................................................................... 4
    Subpoena Coverage .............................................................................................................. 4

**III. DEFINITIONS** ....................................................................................................................... 5

**IV. EXCLUSIONS** ...................................................................................................................... 11
    What This Policy Does Not Cover ....................................................................................... 11
    Innocent Insured Provision ................................................................................................. 12

**V. CONDITIONS** ...................................................................................................................... 14
    Limit of Liability ................................................................................................................ 14
    Retention ............................................................................................................................. 16
    Defense and Settlement of Claims ...................................................................................... 16
    Multiple Policies ................................................................................................................. 17
    Notice of Claims and Circumstances .................................................................................. 17
    Extended Reporting Period Options .................................................................................... 18
    Policy Territory ................................................................................................................... 22
    Assistance and Cooperation of the Insured ......................................................................... 22
    Subrogation ......................................................................................................................... 22
    Cancellation; No Obligation to Renew ............................................................................... 23
    Change in Risk .................................................................................................................... 23
    Other Insurance .................................................................................................................. 24
    Assignment ......................................................................................................................... 24
    Legal Action Against the Insured ....................................................................................... 24
    Application .......................................................................................................................... 24
    Changes .............................................................................................................................. 25
    Waiver ................................................................................................................................ 25
    Entire Agreement ............................................................................................................... 25
    Headings ............................................................................................................................. 25



<center>

**ALLIED WORLD INSURANCE COMPANY**
**1690 New Britain Avenue, Suite 101, Farmington, CT 06032**
**Tel. (860) 284-1300 · Fax (860) 284-1301**

---

**ALLIED WORLD *LPL ASSURE***
**LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY**

</center>

---

**I.      INSURING AGREEMENT**

The **Insurer** will pay on behalf of an **Insured**, subject to the applicable Limit of Liability set forth in Item 3.I. of the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out any of the following **Wrongful Acts** by an **Insured** first made during the **Policy Period** or any Extended Reporting Period:

A.      **Legal Services Wrongful Act**

B.      **Privacy Wrongful Act**

C.      **Network Security Wrongful Act**

It is a condition precedent to coverage under this Policy that any **Wrongful Act** upon which a **Claim** is based occurred:

1.      during the **Policy Period**; or

2.      on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

    (a)      the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and

    (b)      prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any fact, circumstance, situation, transaction, event or **Wrongful Act** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

    (c)      there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

Subject to the applicable Limit of Liability set forth in the Declarations, the **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

## II.    ADDITIONAL COVERAGES

A.    Supplemental Privacy Coverage

1.    Crisis Management Coverage

The **Insurer** shall reimburse the **Named Insured**, subject to the Limit of Liability set forth in Item 3.II.(a) of the Declarations and the applicable Retention, those **Crisis Management Expenses** incurred by the **Named Insured** in connection with **Material Events** which first take place or are reasonably anticipated to first take place during the **Policy Period**.

As a condition precedent to coverage under this Additional Coverage A.1.:

(a)    The public relations firm, crisis management firm or law firm selected by the **Named Insured** to perform services must be approved in writing by the **Insurer**, prior to the **Named Insured** incurring any **Crisis Management Expenses**;

(b)    The actual or anticipated **Material Event** shall be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the termination of the **Policy Period**; and

(c)    **Crisis Management Expenses** must be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the **Named Insured** first incurs such **Crisis Management Expenses**.

2.    Notification and Credit Monitoring Costs Coverage

The **Insurer** shall reimburse the **Named Insured**, subject to the Limit of Liability set forth in Item 3.II.(a) of the Declarations and the applicable Retention, the costs incurred by the **Named Insured** for notification to, and for credit monitoring of, any third parties, arising from a **Privacy Wrongful Act**, which takes place during the **Policy Period**.

Such costs may be incurred by the **Named Insured** pursuant to a U.S. federal or state statute.  Such costs are not eligible for coverage under this Additional Coverage A.2. in the event such costs are covered as **Damages** under Insuring Agreement I.B.

As a condition precedent to coverage under this Additional Coverage A.2.:

(a)    Any notification or credit monitoring costs incurred pursuant to a statutory mandate by the **Named Insured** arising from a **Privacy Wrongful Act** must be reported to the **Insurer** as soon as practicable after the **Privacy Wrongful Act** takes place, but in no event later than thirty (30) days after the **Named Insured** first incurs such costs.

3. Data Forensics Coverage

The **Insurer** shall reimburse the **Named Insured**, subject to the Limit of Liability set forth in Item 3.II.(a) of the Declarations and the applicable Retention, for **Data Forensic Expenses** incurred by the **Named Insured** in connection with a **Data Breach** which first occurs during the **Policy Period** and which the **Insured** reasonably believes might result in a **Claim** for a **Privacy Wrongful Act** or a **Network Security Wrongful Act**.

Such costs are not eligible for coverage under this Additional Coverage A.3. in the event such costs are covered as **Damages** under Insuring Agreement I.B or I.C.

As a condition precedent to coverage under this Additional Coverage A.3.:

(a) The forensics firm selected by the **Named Insured** to perform data forensic services in connection with such **Data Breach** must be approved in writing by the **Insurer**, prior to the **Named Insured** incurring any **Data Forensic Expenses**;

(b) The **Data Breach** shall be reported to the **Insurer**, as soon as practicable after it is discovered by the **Insured**, but in no event later than thirty (30) days after the termination of the **Policy Period**; and

(c) **Data Forensic Expenses** must be reported to the **Insurer** as soon as practicable, but in no event later than thirty (30) days after the **Named Insured** first incurs such **Data Forensic Expenses**.

B. Non-Profit Director and Officer Coverage

The **Insurer** will reimburse an individual **Insured** lawyer, subject to the Limit of Liability set forth in Item 3.II.(b) of the Declarations and the applicable Retention, all amounts that such **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out of a **Non-Profit Director or Officer Wrongful Act** that is first made during the **Policy Period** or any Extended Reporting Period.

The coverage provided under this Additional Coverage B. is specifically excess of, and shall not contribute with, any other insurance plan or program of insurance or self-insurance carried by the **Non-Profit Organization**, or any contribution and indemnification to which the individual **Insured** lawyer is entitled to from such **Non-Profit Organization**.

The most the **Insurer** shall pay for all **Claims** for which coverage is provided under this Additional Coverage B. shall be an amount equal to the lesser of:

(a) The per **Claim** Limit of Liability under the **Non-Profit Organization's** Directors and Officers Liability Insurance; or

(b) The Limit of Liability set forth in Item 3.I.(a) of the Declarations;

up to a maximum amount of $500,000 per **Claim** and in the aggregate for all such **Claims**. Any payment made under this Additional Coverage B. shall be part of, and not in addition to, the applicable Limit of Liability set forth in Item 3.I. of the Declarations.

As a condition precedent to coverage under this Additional Coverage B.:

(a) The individual **Insured** lawyer serving as a director, officer or committee member of the **Non-Profit Organization** must do so with the express consent or at the request of the **Named Insured**;

(b) The **Non-Profit Organization** will have, in full force and effect during the **Policy Period** or any Extended Reporting Period, Directors and Officers Liability Insurance with Limits of Liability of at least $500,000 per claim and in the aggregate for all claims; and

(c) No more than ten percent (10%) of the **Named Insured's** annual gross revenues are derived directly or indirectly from **Legal Services** performed by any **Insured** for the **Non-Profit Organization**.

C.    Lost Earnings Coverage

The **Insurer** shall reimburse each **Insured,** subject to the Limit of Liability set forth in Item 3.II.(c) of the Declarations, for personal earnings actually lost each day or part of a day such **Insured**, at the **Insurer's** express request, attends a hearing, deposition, mediation, settlement conference, arbitration or trial arising from a **Claim** first made during the **Policy Period** and reported to the **Insurer** in accordance with Section V.E. of the Policy. Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations and shall not be subject to any Retention.

This coverage shall not apply in the event of a **Disciplinary Proceeding**.

D.    Disciplinary Proceedings Coverage

The **Insurer** will pay on behalf of an **Insured** subject to the Limit of Liability set forth in Item 3.II.(d) of the Declarations, reasonable fees, costs and expenses incurred in responding to a **Disciplinary Proceeding** initiated against the **Insured** and reported to the **Insurer** during the **Policy Period** or any Extended Reporting Period. Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations and shall not be subject to any Retention.

E.    Subpoena Coverage

Subject to the Limit of Liability set forth in Item 3.II.(e) of the Declarations, if during the **Policy Period** an **Insured** receives a **Subpoena** arising out of the performance of or failure to perform **Legal Services,** the **Insured** may obtain the **Insurer's** assistance in responding to the **Subpoena** by providing the **Insurer** with a copy of the **Subpoena**. The **Insurer** shall retain an attorney to provide advice regarding the production of documents, to prepare the **Insured** for sworn testimony, and to represent the **Insured** at the **Insured's** deposition, provided that:

(a) The **Subpoena** must be reported to the **Insurer** as soon as practicable, but in no event later than the termination of the **Policy Period**;

(b) The **Subpoena** must arise out of a lawsuit to which the **Insured** is not a party; and

(c) The **Insured** has not been engaged to provide advice or testimony in connection with the lawsuit, nor has the **Insured** provided such advice or testimony in the past.

Any payment made by the **Insurer** under this provision shall be in addition to the Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations and shall not be subject to any Retention.

Any notice the **Insured** gives the **Insurer** of such **Subpoena** shall be deemed notification of a potential **Claim** under Section V.E.3. of this Policy.

## III. DEFINITIONS

A. **APPLICATION** means: (a) the application, including any competitor's application, submitted to the **Insurer**, or any affiliate thereof, for this Policy or any other policy; (b) any attachments and other materials provided with any such application or incorporated into any such application; and (c) any other materials and information submitted by the **Insured** to the **Insurer** in connection with the underwriting of this Policy.

B. **BODILY INJURY** means injury to the body, sickness or disease sustained by any person, including death resulting from such injuries; including any mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person, whether or not resulting from injury to the body, sickness, disease or death of any person.

C. **CLAIM** means:

1. any written notice or demand for monetary relief or **Legal Services**;
2. any civil proceeding in a court of law;
3. any administrative proceeding, other than a **Disciplinary Proceeding**; or
4. a request to toll or waive a statute of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for any **Wrongful Act**.

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

A **Claim** will be deemed to have been first made when an **Insured** receives written notice of the **Claim**.

D.    **CLAIM EXPENSES** means:

    1.    reasonable fees, costs and expenses charged by attorneys retained or approved by the **Insurer** for a **Claim** brought against an **Insured**;

    2.    reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the **Insurer** to apply for or furnish such bond.

        **Claim Expenses** shall not include:

        (a)    salaries, loss of earnings, reimbursement for the **Insured's** time or attendance required in any investigation or defense;

        (b)    other remuneration by or to any **Insured**.

The determination by the **Insurer** as to the reasonableness of **Claim Expenses** shall be conclusive on all **Insureds**.

E.    **CONFIDENTIAL INFORMATION** means any confidential information of a client or third party which is obtained by the **Insured** for the purpose of providing **Legal Services**, including but not limited to:

    1.    any information subject to the attorney-client privilege;

    2.    information from which an individual may be uniquely and reliably identified, including, but not limited to an individual's name, address, telephone number, in combination with their social security number, account relationships, account numbers, passwords, PIN numbers, credit card numbers or biometric information;

    3.    "nonpublic personal information" as defined by Title V of the Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) ("GLB"), as amended, and any regulations    promulgated thereto;

    4.    "protected health information" as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA"), or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111-5), as amended, and any regulations promulgated thereto;

    5.    personal information as defined in the California Database Protection Act of 2003 (Cal. SB 1386) and California A.B. 1950, as amended, and any regulations promulgated thereto; or

    6.    personal and confidential information as defined in any U.S. federal or state privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder, or any similar or related laws or regulations of any foreign jurisdiction.

F.  **CRISIS MANAGEMENT EXPENSES** means the following amounts when incurred during, or within ninety (90) days prior to, a **Material Event**:

1.  amounts for which the **Named Insured** becomes legally liable for those services performed by a public relations firm, crisis management firm or law firm selected by the **Named Insured** and approved in advance in writing by the **Insurer**, to minimize potential harm to the **Named Insured** arising from a **Material Event,** including, without limitation, maintaining and restoring public confidence in the **Named Insured**, and providing advice to the **Named Insured** or any of its directors, officers, partners or employees; and

2.  amounts for which the **Named Insured** becomes legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, partners, employees or the firm rendering services as referenced above.

**Crisis Management Expenses** shall not include compensation, fees, benefits, overhead, or the charges or expenses of any **Insured**.

G.  **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest.

**Damages** shall not include:

1.  criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

2.  punitive, exemplary or the multiplied portion of multiple damages;

3.  amounts deemed uninsurable by law;

4.  the return or restitution of legal fees, costs and expenses, no matter how claimed;

5.  amounts paid or incurred by an **Insured** to comply with a judgment or settlement for any form of equitable or non-monetary relief; or

6.  amounts incurred by an individual or entity providing support services to the **Insured** resulting from an interruption of such individual or entity's business operations.

H.  **DATA BREACH** means the unauthorized misappropriation or disclosure of **Confidential Information** that is in the physical possession of the **Insured** or which is stored on, transmitted or received by, the **Named Insured's Network.**

I.  **DATA FORENSIC EXPENSES** means the reasonable and necessary costs incurred by the **Named Insured** to retain a qualified forensics firm to investigate, examine and analyze the **Named Insured's Network**, to find the cause, source and extent of a **Data Breach**.

J.  **DIGITAL ASSETS** means software and electronic data that is stored on or within the **Named Insured's Network**. **Digital Assets** shall include the capacity of the **Named Insured's Network** to store and process data and information and electronically disseminate data and information over the Internet.

K. **DISCIPLINARY PROCEEDING** means any proceeding initiated by a regulatory, disciplinary or licensing official, board or agency to investigate charges made against an **Insured** alleging professional misconduct in the performance of or failure to perform **Legal Services**.

L. **IDENTITY THEFT** means the misappropriation of the **Confidential Information** that is in the **Insured's** care, custody and control, which has resulted in the wrongful or fraudulent use of such **Confidential Information**, including but not limited to, fraudulently emulating the identity of an individual or corporation.

M. **IMMEDIATE FAMILY** means:

1. the **Insured**;
2. the **Insured's** lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or any formal program established by the **Named Insured**);
3. the **Insured's** parents, adoptive parents, or step-parents;
4. the **Insured's** siblings or step-siblings;
5. the **Insured's** children, adoptive children, or step-children.

N. **INSURED** means:

1. the **Named Insured**;

2. any **Predecessor Firm;**

3. any lawyer or professional corporation listed in the **Application**, on the day the **Policy Period** incepts until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

4. any lawyer or professional corporation who becomes a partner, officer, director, stockholder or shareholder or employee of the **Named Insured** during the **Policy Period** until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

5. any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** or **Predecessor Firm**;

6. any person or entity who is designated by the **Named Insured** as counsel or of counsel in the **Application**, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured**;

7. any other person who is employed or retained by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in the performance of or failure to perform **Legal Services** on behalf of the **Named Insured** and also only within the scope of such employment or retention agreement; and

8. the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

O. **INSURER** means the company identified in the Declarations.

P. **LEGAL SERVICES** means those services performed on behalf of the **Named Insured** for others by an **Insured**, whether or not performed for a fee or other consideration, as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, administrator, conservator, receiver, executor, guardian, trustee, fiduciary or escrow agent, but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer. **Legal Services** also include services rendered by an **Insured** as a: (a) member of a formal accreditation, ethics, peer review or licensing board, standards review board, bar association, or any similar board or committee; (b) expert witness in a legal malpractice proceeding; or (c) author, publisher or presenter of legal research or legal articles and papers, but only if the compensation received by the **Insured** annually from such services is less than $5,000. **Legal Services** do not include services rendered as a real estate agent or broker, as an insurance agent or broker or as a certified public accountant.

Q. **LEGAL SERVICES WRONGFUL ACT** means:

1. any actual or alleged act, error or omission committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**; or

2. any actual or alleged **Personal Injury** committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**.

R. **MALICIOUS CODE** means unauthorized and either corrupting or harmful software code, including but not limited to computer viruses, Trojan horses, worms, logic bombs, spy ware or spider ware.

S. **MATERIAL EVENT** means the publication, in media of widespread distribution, of unfavorable information relating to a **Data Breach** or the **Privacy** and **Network Security Wrongful Acts** of an **Insured**, which can be reasonably considered to lessen public confidence in the competence, integrity or viability of the **Named Insured** to conduct business.

T. **NAMED INSURED** means the entity named in Item 1. of the Declarations.

U.     **NETWORK** means computer hardware, software, firmware, and components thereof, including **Digital Assets** stored thereon, which are connected through two or more computers, including such networks accessible through the Internet, intranets, extranets or virtual private networks.  **Network** shall not include the computer hardware, software, firmware, or components thereof, of any third party provider of telephone, telecommunications, cable, Internet, or satellite services.

V.     **NETWORK SECURITY** means the use of hardware, software and firmware, including, without limitation, firewalls, filters, routers, intrusion detection software, antivirus software, automated password management applications and other authentication mechanisms, which are designed to control or restrict the access to a **Network**, or parts thereof.

W.     **NETWORK SECURITY WRONGFUL ACT** means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty committed by an **Insured**, solely in connection with the performance of or failure to perform **Legal Services**, which results in a breach of the **Insured's Network Security**, the consequences of which are:

1.     the inability of a client or authorized third party to gain access to the **Insured's** website or **Network** in order to transmit or access documents or information;

2.     **Identity Theft**;

3.     the transmission of **Malicious Code**; or

4.     the unauthorized release of a client or third party's confidential and proprietary business information which is obtained by the **Insured** for the purpose of providing **Legal Services**.

X.     **NON-PROFIT DIRECTOR OR OFFICER WRONGFUL ACT** means any actual or alleged act, error or omission committed by an individual **Insured** lawyer while serving in his or her capacity as a director, officer or committee member of a **Non-Profit Organization**.

Y.     **NON-PROFIT ORGANIZATION** means a corporation or organization, other than an **Insured** entity, which is exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as the same may be amended from time to time.

Z.     **PERSONAL INJURY** means libel, slander, violation of a right of privacy, false arrest, detention, imprisonment, wrongful entry, eviction, malicious prosecution or abuse of process, when insurable under the law pursuant to which this Policy shall be construed.

AA.    **POLICY PERIOD** means the period from the Inception Date shown in Item 2. of the Declarations to the earlier of the Expiration Date shown in Item 2. of the Declarations, or the effective date of cancellation of this Policy.

BB.    **PREDECESSOR FIRM** means any individual or entity engaged in **Legal Services** to whose financial assets and liabilities the **Named Insured** is the majority successor-in-interest.

CC. **PRIVACY WRONGFUL ACT** means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty committed by any **Insured**, solely in connection    with the performance of or failure to perform **Legal Services**, which results in:

1. the misappropriation or disclosure of **Confidential Information**; or

2. a breach or violation of U.S. federal or state law or regulations or any similar or related laws or regulations  of any foreign jurisdiction associated with the the of the actual or potential unauthorized access to or disclosure of **Confidential Information,** or any similar or related laws or regulations of any foreign jurisdiction.

**Privacy Wrongful Act** shall not include any breach or violation of any U.S. federal or state law or any similar or related laws or regulations of any foreign jurisdiction if such breach or violation is not the result of the actual or potential unauthorized disclosure of, or access to **Confidential Information.**

DD. **RELATED ACT OR OMISSION** means all acts or omissions based on, arising out of, directly or indirectly resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

EE. **RETROACTIVE DATE** means the applicable date specified in Item 7. of the Declarations.

FF. **SUBPOENA** means a written judicial order issued to any **Insured** to provide testimony or to produce or allow the inspection of documents, records, notes, electronic information, tape recordings, photographs, taped footage or other related materials.

GG. **TOTALLY AND PERMANENTLY DISABLED** means a medically determinable impairment of the mind or body which wholly prevents an **Insured** from providing **Legal Services**, when such impairment is reasonably certain to continue throughout the lifetime of the **Insured** or to result in death.

HH. **WRONGFUL ACT** means a **Legal Services Wrongful Act**, **Privacy Wrongful Act**, **Network Security Wrongful Act** or a **Non-Profit Director and Officer Wrongful Act**.

## IV.  EXCLUSIONS

A. This Policy does not cover any **Claim** or **Disciplinary Proceeding**:

1. based upon, involving or contributed to by any dishonest, fraudulent, criminal, malicious, or intentional act or omission, or any willful violation of any statute, rule or law, by an **Insured**;

This Exclusion A.1. shall not apply unless such conduct has been established by an admission, final adjudication or finding in the proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**.

Whenever coverage under this Policy would be excluded, suspended or lost due to this Exclusion A.1., the **Insurer** agrees that such insurance as would otherwise be afforded under this Policy shall be applicable with respect to any **Insured** who did not acquiesce in or remain passive after having knowledge of such conduct.

2.    brought by or on behalf of, or in the name or right of, any **Insured**;

provided, however, that this Exclusion A.2. shall not apply to any **Claim** which arises out of **Legal Services** rendered by one **Insured** to another where an attorney-client relationship exists between such **Insureds**.

3.    for any actual or alleged violation by an **Insured** of the Employment Retirement Income Security Act of 1974, its amendments, or any regulation or orders promulgated pursuant thereto, or of any similar provisions of federal, state or local law or regulation;

4.    alleging, arising out of, based upon or attributable to any actual or alleged act, error or omission of any natural person who is not an **Insured**, if such **Claim** or **Disciplinary Proceeding** is based upon office-sharing arrangements, theories of partnership by estoppel, apparent partnership, apparent agency, ostensible agency, vicarious liability, or any similar theory.

B.    This Policy does not cover any **Claim** or **Disciplinary Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:

1.    any act whatsoever of an **Insured** in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate;

2.    the **Insured's** capacity or status as:

(a)    an officer, director, partner, trustee, shareholder, manager or employee of a: (i) business enterprise; (ii) charitable organization; (iii) pension fund or trust; (iv) welfare fund or trust; (v) profit sharing fund or trust; (vi) mutual fund or trust; or (vii) investment fund or trust;

provided, however, that this Exclusion B.2.(a) shall not apply to an otherwise covered **Claim** for any **Non-Profit Director or Officer Wrongful Act**; or

(b)    a public official, or an employee of a governmental body, subdivision, or agency unless the **Insured** is privately retained solely to render **Legal Services** to the governmental body, subdivision or agency and the remuneration for the **Legal Services** is paid directly or indirectly to the **Named Insured**.

3.    any actual or alleged **Wrongful Acts** of an **Insured**, whether or not such **Legal Services** are performed with or without compensation, for any business enterprise, whether for profit or not-for-profit, in which any **Insured**, or a member of an **Insured's Immediate Family**, has a "Material Interest."

For purposes of this Exclusion B.3., a "Material Interest" shall mean the right of an **Insured** or a member of an **Insured's Immediate Family** directly or indirectly to:

(a)     own 10% or more of an interest in an entity;

(b)     vote 10% or more of the issued and outstanding voting stock in an incorporated entity;

(c)     elect 10% or more of the directors of an incorporated entity;

(d)     receive 10% or more of the profits of an unincorporated entity; or

(e)     act as general partner of a limited partnership, managing general partner of a general partnership, or comparable positions in any other business enterprise.

4.     the alleged rendering of investment advice, including advice given by any **Insured** to make any investment or to refrain from doing so;

5.     liability assumed by an **Insured** under an indemnity, hold harmless or liquidated damages provision or agreement, or similar provisions or agreements;

provided, however, that this Exclusion B.5. shall not apply if such liability would have attached to the **Insured** by law in the absence of such provision or agreement;

6.     the notarized certification or acknowledgement of signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

7.     **Bodily Injury**, and injury to, or destruction of, any tangible property, including the loss of use resulting therefrom;

provided however, that the exclusion of **Bodily Injury** does not apply to that portion of a **Claim** for mental injury, mental anguish, mental tension, or emotional distress caused by:

(a)     **Personal Injury**;

(b)     a **Non-Profit Director and Officer Wrongful Act**; or

(c)     a **Privacy Wrongful Act**

8.     the loss of value of any asset in the **Insured's** care, custody or control, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling of client funds.

C.     This Policy does not cover **Damages** from any **Claim** arising out of **Privacy Wrongful Acts** and **Network Security Wrongful Acts**, **Crisis Management Expenses** from a **Material Event**, notification and credit monitoring costs from a **Privacy Wrongful Act** or **Data Forensic Expenses** from a **Data Breach** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the following:

1.     unsolicited electronic dissemination of faxes, e-mails, text messages or similar communications to actual or prospective customers of the **Insured** or to any other third party, including but not limited to any violation of the Telephone Consumer Protection Act, any federal or state anti-spam statute, or

any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion;

2. failure, interruption or reduction in supply of utility service or infrastructure, including, without limitation, electrical, gas, water, telephone, Internet, cable, satellite, or telecommunications;

3. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power;

4. the return, reinvestment, reimbursement or replacement of funds, monies or securities or anything of monetary value that an **Insured** holds, receives or transfers, or fails to hold, receive or transfer, including any interest that accrued or failed to accrue;

5. any wireless network that is not protected by either Wi-Fi Protected Access ("WPA") or any other security protocol that provides equal or greater protection than WPA;

6. the use of a laptop computer, portable computer or other portable electronic device which does not employ whole disc encryption;

7. back -up tapes, optical media, or any other form of portable back-up media which are not encrypted;

8. expiration or withdrawal of technical support by a software vendor;

9. any actual or alleged violation of any law or statute protecting any patent, or any rule or regulation promulgated thereunder or of any provision of the common law imposing liability in connection therewith; or the misappropriation, misuse or disclosure of confidential and proprietary business information or trade secrets, other than a **Network Security Wrongful Act** as specifically described in Definition W., part 4.

## V. CONDITIONS

### A. LIMIT OF LIABILITY

Regardless of the number of **Claims**, claimants, **Material Events**, **Privacy Wrongful Acts**, **Data Breaches** or other matters giving rise to coverage under this Policy, or the number of persons or entities included within the definition of **Insured**, the **Insurer's** liability is limited as follows:

1. Limit of Liability for Insuring Agreements

   (a) The Limit of Liability set forth in Item 3.I.(a) of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. for all **Damages** and **Claim Expenses** resulting from each **Claim** for **Legal Services Wrongful Acts, Privacy Wrongful Acts** and **Network Security Wrongful Acts**.

(b)     The Aggregate Limit of Liability for Insuring Agreement I. of this Policy, as set forth in Item 3.I.(b) of the Declarations, is the **Insurer's** maximum liability for all **Damages** and **Claim Expenses** resulting from all **Claims** for **Legal Services Wrongful Acts**, **Privacy Wrongful Acts** and **Network Security Wrongful Acts**.

2.  Limits of Liability for Additional Coverages

(a)     The Shared Aggregate Limit of Liability, as set forth in Item 3.II.(a) of the Declarations, is the **Insurer's** maximum liability for all amounts payable under Additional Coverage A., Supplemental Privacy Coverage.

(b)     The Limits of Liability, as set forth in Item 3.II.(b) of the Declarations is the **Insurer's** maximum liability for all **Damages** and **Claim Expenses** resulting from each and every **Claim** and all **Claims** for **Non-Profit Director or Officer Wrongful Acts**.

(c)     The Limits of Liability, as set forth in Items 3.II.(c) – 3.II.(e) of the Declarations, is the **Insurer's** maximum liability for Additional Coverages C, D and E.  Any amounts paid under these Additional Coverages are in addition to the Policy Aggregate Limit of Liability set forth in Item 3.III.(a) of the Declarations.

3.  Policy Aggregate Limit of Liability

The Policy Aggregate Limit of Liability for this Policy, as set forth in Item 3.III.(a) of the Declarations, is the **Insurer's** maximum liability under Insuring Agreement I. and Section II., Additional Coverages A and B.

4.  Claim Expenses

**Claim Expenses** are part of and not in addition to the Limit of Liability and shall reduce and may exhaust the Limit of Liability.  The Limit of Liability shall first be applied to **Claim Expenses** with the remainder, if any, being the amount available to pay as **Damages**.

5.  Exhaustion of Limit of Liability

The **Insurer** shall not be obligated to pay any **Damages**, **Claim Expenses** or any other amounts payable under this Policy or to defend or continue to defend any **Claim** after the Limit of Liability set forth in Item 3.III.(a) has been exhausted. In such case, the **Insurer** shall have the right to withdraw from the further investigation or defense of any pending **Claim** by tendering control of such investigation or defense to the **Named Insured** and the **Named Insured** agrees, as a condition to the issuance of this Policy, to accept such tender and proceed solely at its own cost and expense.

B.    **RETENTION**

1.    With respect to the coverage provided under Insuring Agreement I., the **Insurer's** obligation to pay **Damages,** including **Claim Expenses**, is in excess of the Retention set forth in Item 4.(a) of the Declarations, which Retention shall apply to each and every **Claim**.

2.    With respect to the coverage provided under Section II. Additional Coverage A., the **Insurer's** obligation to pay any amounts payable is in excess of the Retention set forth in Item 4.(b) of the Declarations, which Retention shall apply to each and every event giving rise to coverage under this Section II.A.

3.    With respect to the coverage provided under Section II. Additional Coverage B., the **Insurer's** obligation to pay **Damages,** including **Claim Expenses**, is in excess of the Retention set forth in Item 4.(c) of the Declarations, which Retention shall apply to each and every **Claim**.

4.    A Retention shall only apply to an Additional Coverage where so indicated on the Declarations.

5.    It is the **Named Insured's** responsibility to pay **Damages, Claim Expenses** or any other amounts payable under this Policy up to the amount of the Retention.  The **Insurer** shall only be liable to pay, subject to the Limit of Liability provisions stated in this Section, for **Damages, Claim Expenses** or any other amounts payable under this Policy in excess of such Retention and such Retention shall not be insured under this Policy.

6.    Solely at the option of the **Insurer**, the **Insurer** may advance all or some portion of the Retention amount in the event that the **Named Insured** fails to do so in a timely manner.  In such event, the **Named Insured** shall pay back the Retention to the **Insurer** no later than fifteen (15) days after demand by the **Insurer**.

C.    **DEFENSE AND SETTLEMENT OF CLAIMS**

1.    The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** covered under this Policy.  The **Insurer** shall select defense counsel for the investigation, defense or settlement of any **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**.

2.    The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into a settlement of any **Claim** that the **Insurer** deems appropriate.

If, however, the **Insured** refuses to consent to any settlement recommended by the **Insurer** and acceptable to the claimant, then subject to the Limit of Liability set forth in Item 3.I.(a) of the Declarations, the **Insurer's** liability for **Damages** and **Claim Expenses** relating to that **Claim** shall not exceed:

(a)    the amount for which the **Claim** could have been settled by the **Insurer**, plus all **Claim Expenses** incurred up to the date the **Insured** refused to settle such **Claim**; plus

(b)      fifty (50) percent of any **Damages** and/or **Claim Expenses** in excess of the amount in clause a. above, incurred in connection with such **Claim**. The remaining **Damages** and/or **Claim Expenses** will be carried by the **Insured** at its own risk and will be uninsured.

3.      The **Insurer** shall not be obligated to pay any **Damages** or **Claim Expenses**, or to defend or continue to defend any **Claim** after the applicable Limit of Liability has been exhausted. If the **Insurer's** Policy Aggregate Limit of Liability as set forth in Item 3.III.(a) of the Declarations is exhausted by the payment of **Damages** and **Claim Expenses**, the entire premium will be deemed fully earned.

4.      The **Insurer**, at its sole discretion, shall have the right and option to retain counsel to investigate and defend any potential **Claim** and to pay for costs or expenses incurred as a result of any such investigation or defense. Any payment of these costs or expenses shall be part of, and not in addition to, the Limit of Liability set forth in Item 3. of the Declarations and subject to the Retention set forth in Item 4. of the Declarations.

5.      If the **Named Insured** has not paid any premiums due or satisfied any applicable Retentions, the **Insurer** has the right, but not the obligation, to settle any **Claims** without the consent of the **Insured**.

## D.    MULTIPLE POLICIES

If this Policy and any other policy issued by the **Insurer** including any Extended Reporting Period coverage afforded by such policy or policies, provides coverage for the same **Claim** against the **Insured**, the maximum limit of liability under all the policies shall not exceed the highest remaining per **Claim** limit of liability under any one policy.

## E.    NOTICE OF CLAIMS AND CIRCUMSTANCES

### 1.    NOTICE ADDRESS

Notice of any actual or potential **Claim** shall be made to the **Insurer** at noticeofloss@awac.com. All other notices shall be made to the **Insurer** at the address shown in Item 5. of the Declarations.

### 2.    NOTICE OF AN ACTUAL CLAIM

(a)      The **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, of a **Claim** made against an **Insured** during the **Policy Period**, as soon as practicable, but in no event later than sixty (60) days after the termination of the **Policy Period**.

(b)      The **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, of a **Claim** made against an **Insured** during any Extended Reporting Period, as soon as practicable, but in no event later than the termination of the Extended Reporting Period.

(c)    In the event suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Insurer** every demand, notice, summons or other process received directly or by an **Insured's** representative.

3.    **NOTICE OF A POTENTIAL CLAIM**

If, during the **Policy Period**, the **Insured** first becomes aware of a **Wrongful Act** which may reasonably be expected to be the basis of a **Claim** against an **Insured**, and the **Insured**, as soon as practicable, but in no event later than the termination of the **Policy Period**, gives the **Insurer** written notice of the **Wrongful Act** including a description of the **Wrongful Act**, allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then the **Insurer** will treat any subsequently resulting **Claim** as if it had first been made during the **Policy Period**.

4.    **FRAUDULENT CLAIM**

If any **Insured** shall commit fraud in proffering any **Claim** with regard to amount or otherwise, this Policy shall become void from the inception as to such **Insured**.

5.    **RELATED CLAIMS**

All **Claims** based upon or arising out of the same **Wrongful Act** or **Related Act or Omission** shall be considered a single **Claim** and shall be considered first made at the time the earliest **Claim** arising out of such **Related Act or Omission** was first made.  In any such event, only one Limit of Liability and one Retention shall apply.

F.    **EXTENDED REPORTING PERIOD OPTIONS**

1.    **AUTOMATIC EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, and if this Policy has been in force for at least six (6) months, or if it has been in force for fewer than six (6) months and the **Insurer** consents, the **Named Insured** shall have the right to a period of sixty (60) days immediately following the effective date of such cancellation or non-renewal, in which to give notice to the **Insurer** of **Claims** first made against the **Insured** during such sixty (60) day period for any **Wrongful Acts** committed prior to the effective date of such cancellation or non-renewal and otherwise covered by this Policy.

2.    **OPTIONAL EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, the **Named Insured** has the right upon notification to the **Insurer** of its intent to purchase an Optional Extended Reporting Period Endorsement, and payment to the **Insurer** of an additional premium as set forth below within sixty (60) days of the cancellation or non-renewal, to extend the period for reporting **Claims** first made against an **Insured** after the termination of the **Policy Period** for any **Wrongful Acts** committed prior to the termination

of the **Policy Period** and otherwise covered by this Policy. For purposes of determining the availability of an Extended Reporting Period Endorsement, any change in the premium or terms on renewal shall not constitute a refusal to renew.

The **Named Insured** may select from the following Optional Extended Reporting Period options:

(a)     a one-year Optional Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6. of the Declarations;

(b)     a two-year Optional Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6. of the Declarations;

(c)     a three-year Optional Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6. of the Declarations;

(d)     a five-year Optional Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6. of the Declarations;

(e)     an unlimited Optional Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6. of the Declarations.

3.     **NON-PRACTICING EXTENDED REPORTING PERIOD**

If an individual **Insured** lawyer, other than a contract attorney, which is listed on the **Application** for this Policy and insured hereunder as of the Inception Date of this Policy, retires or otherwise ceases the private practice of law in all jurisdictions during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to purchase a Non-Practicing Extended Reporting Period Endorsement. Unless the **Insured** qualifies for a waiver of premium under Paragraph F.4. below, such **Insured** must make payment to the **Insurer** of an additional premium as set forth below prior to the termination of the **Policy Period**. The Non-Practicing Extended Reporting Period will extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the private practice of law and otherwise covered by this Policy. If an individual **Insured** lawyer shall resume the practice of law at any time, for any reason, in any jurisdiction, the Non-Practicing Extended Reporting Period elected by such **Insured** shall no longer be effective.

Coverage for any **Claim** first made during a Non-Practicing Extended Reporting Period shall be excess over and shall not contribute with any other insurance in effect on or after the effective date of the Non-Practicing Extended Reporting Period, which covers the **Insured** for such **Claim**.

The additional premium for a Non-Practicing Extended Reported Period shall be calculated using the per individual **Insured** lawyer rate in effect upon the Inception Date of this Policy, based on the number of lawyers with the **Named Insured** at the Inception Date of this Policy, as stated on the **Application** or most recent Renewal Application, multiplied by the percentage set forth below which corresponds to the number of years elected for the Non-Practicing Extended Reporting Period.

The **Insured** may select from the following Non-Practicing Extended Reporting Period options:

(a)     a one-year Non-Practicing Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6. of the Declarations;

(b)     a two-year Non-Practicing Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6. of the Declarations;

(c)     a three-year Non-Practicing Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6. of the Declarations;

(d)     a five-year Non-Practicing Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6. of the Declarations;

(e)     an unlimited Non-Practicing Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6. of the Declarations.

4.     **WAIVER OF PREMIUM FOR NON-PRACTICING EXTENDED REPORTING PERIOD**

(a)     Waiver Upon Death

If an individual **Insured** lawyer, as described in Section V.F.3. above, dies during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium, until the executor or administrator of the estate of such individual **Insured** lawyer is discharged, provided always that the death did not result from an intentionally self-inflicted injury, suicide or alcohol or drug abuse. Written notification and written proof of death of the **Insured** must be provided prior to the termination of the **Policy Period**. Such Non- Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of death and otherwise covered by this Policy.

(b)     Waiver Upon Disability

If an individual **Insured** lawyer, as described in Section V.F.3. above, becomes **Totally and Permanently Disabled** during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended

Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium. It shall be a condition precedent to the Non-Practicing Extended Reporting Period that: (1) the disability did not result from intentionally self-inflicted injuries, or from attempted suicide, or from alcohol abuse or from drug abuse; (2) the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years; (3) the **Insured** or his or her legal guardian provides written notice of the disability to the **Insurer** prior to the termination of the **Policy Period**; and (4) the **Insured** or the **Insured's** legal guardian provides a physician's written certification of the disability, including the date it began. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the date the **Insured** is deemed **Totally and Permanently Disabled** and otherwise covered by this Policy.

(c) Waiver For Continuous Coverage

If an individual **Insured** lawyer, as described in Section V.F.3. above, retires or otherwise ceases the private practice of law during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to elect an unlimited Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium. A condition precedent to the Non-Practicing Extended Reporting Period shall be that the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years. The **Insured** must provide written notice of his or her request to elect the Non-Practicing Extended Reporting Period prior to the termination of the **Policy Period**. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the private practice of law and otherwise covered by this Policy.

5. **CONDITIONS APPLICABLE TO ALL EXTENDED REPORTING PERIOD OPTIONS**

(a) The right to any of the Extended Reporting Period Endorsement options is not available to any **Insured** if:

(i) cancellation or nonrenewal by the **Insurer** is due to either: nonpayment of premium, Retention or other money due to the **Insurer**; or misrepresentation in the **Application**; or the failure to comply with the terms and conditions of this Policy; or

(ii) the **Insured's** right or license to practice law is suspended, surrendered or revoked.

(b)     The Limit of Liability available for any Extended Reporting Period is part of, and not in addition to, the Limit of Liability shown in Item 3. of the Declarations of the Policy.

(c)     The Retention, as shown on the Declarations, which is applicable to **Claims** first made during any Extended Reporting Period, will apply separately to each and every **Claim**.  The Retention will be waived for **Claims** first made during a Non-Practicing Extended Reporting Period in the event that an individual **Insured** lawyer qualifies for a Non-Practicing Extended Reporting Period based on: (i) the death of the **Insured**; or (ii) becoming **Totally and Permanently Disabled**.

(d)     None of the Extended Reporting Period options are cancelable or renewable.  Any additional premium, if applicable, for the Extended Reporting Period Endorsement is fully earned at the inception of the Extended Reporting Period.

G.     **POLICY TERRITORY**

The coverage afforded by this Policy applies to any **Wrongful Acts** that occur anywhere in the world, and **Claims** brought anywhere in the world.

H.     **ASSISTANCE AND COOPERATION OF THE INSURED**

All **Insureds** shall cooperate with the **Insurer**, including providing all information requested by the **Insurer** regarding any **Claim**, and cooperating fully with the **Insurer** in the defense, investigation and settlement of any **Claim**.  Upon the **Insurer's** request, all **Insureds** shall submit to examination by a representative of the **Insurer**, under oath if required.  In addition, upon the **Insurer's** request, all **Insureds** shall attend hearings, depositions, mediations, settlement conferences, arbitrations and trials, and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, all without charge to the **Insurer**.

The **Insured** shall follow the **Insurer's** direction regarding whether to accept or reject a demand for arbitration of any **Claim** and shall not voluntarily agree to arbitrate a **Claim** without the **Insurer's** written consent.  No **Insured** shall, except at the **Insured's** own cost, make any payment, make any admission, admit liability, waive any rights, settle any **Claim**, assume any obligation or incur any expense without the prior written consent of the **Insurer**.

I.     **SUBROGATION**

The **Insurer** shall be subrogated to all **Insureds'** rights of recovery against any person or organization.  All **Insureds** shall assist the **Insurer** in effecting any rights of indemnity, contribution and apportionment available to any **Insured**, including the execution of such documents as are necessary to enable the **Insurer** to pursue claims in the **Insureds'** names and shall provide all other assistance and cooperation which the **Insurer** may reasonably require.  All **Insureds** shall cooperate with the **Insurer** and do nothing to jeopardize, prejudice or terminate in any way such rights.

The **Insurer** shall not exercise any such rights against any **Insured** except as provided herein.  Notwithstanding the foregoing, however, the **Insurer** reserves the right to

exercise any rights of subrogation against any **Insured** with respect to any **Claim** brought about or contributed to by the dishonest, fraudulent, criminal, malicious, or intentional act or omission, or any willful violation of any statute of such **Insured**.

J.   **CANCELLATION; NO OBLIGATION TO RENEW**

1.   This Policy shall terminate upon the Expiration Date set forth in Item 2. of the Declarations, or upon any earlier cancellation.

2.   This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect. If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

3.   This Policy may be canceled by the **Insurer** by written notice mailed to the **Named Insured** at its last known address at least sixty (60) days before the effective date of such cancellation, if for reasons other than nonpayment of premium. The **Insurer** may cancel this Policy for nonpayment of premium by written notice mailed to the **Named Insured** at its last known address at least ten (10) days before the effective date of such cancellation. The notice will state the reason for and the effective date of the cancellation. If the Policy is canceled by the **Insurer,** the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis.

4.   Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

5.   The **Insurer** will not be required to renew this Policy upon its expiration. If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail written notice, to the **Named Insured** at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2. of the Declarations. Such notice shall state the specific reason(s) for non-renewal.

K.   **CHANGE IN RISK**

1.   If, during the **Policy Period**, any of the following events occur:

(a)   the merger into or acquisition of the **Named Insured** by another entity such that the **Named Insured** is not the surviving entity, or the acquisition of substantially all of the assets of the **Named Insured**;

(b)   the dissolution of, or appointment of a receiver, conservator, trustee, liquidator or rehabilitator or similar official for the **Named Insured**;

the **Named Insured** shall report the event to the **Insurer** within thirty (30) days of such event occurring.

Coverage under this Policy will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed on or after such event.

After any such event, this Policy may not be canceled by the **Insured** and the entire premium for this Policy will be deemed fully earned.

2. If, during the **Policy Period**, the number of lawyers or professional corporations performing **Legal Services** on behalf of the **Named Insured** increases by 50% or more, the **Named Insured** shall notify the **Insurer** in writing within thirty (30) days. The **Insurer** shall have the right to modify the terms and conditions of the Policy, including premium, as it determines in its sole discretion is appropriate.

L.   **OTHER INSURANCE**

The insurance provided by this Policy shall apply only as excess over any other valid and collectible insurance, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this Policy. This Policy shall not be subject to the terms and conditions of any other insurance policy.

M.   **ASSIGNMENT**

Neither this Policy nor any **Insured's** interest under this Policy may be assigned.

N.   **LEGAL ACTION AGAINST THE INSURER**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy and the amount of all the **Insured's** obligations to pay have been fully and finally determined either by judgment against all **Insureds** after actual trial, or by written agreement of the **Named Insured**, the claimant and the **Insurer**.

Nothing contained in this Policy shall give any person or organization any right to join the **Insurer** as a defendant in the action against any **Insured**.

O.   **APPLICATION**

By acceptance of this Policy, all **Insureds** affirm or reaffirm as of the Inception Date of this Policy that:

1. the statements in the **Application** are true and accurate and are specifically incorporated herein, and are all **Insureds'** agreements, personal representations and warranties;
2. all such communicated information shall be deemed material to the **Insurer's** issuance of this Policy;
3. this Policy is issued in reliance upon the truth and accuracy of such representations;
4. this Policy embodies all agreements existing between the **Insureds** and the **Insurer**, or any of its agents, relating to this insurance; and
5. if any representation is false or misleading, this Policy shall be void from the inception.

P.    **CHANGES**

No change or modification of this Policy shall be effective except when made by a written endorsement to this Policy signed by an authorized representative of the **Insurer**. No representations by any person shall have any force or effect except as included in such endorsement.

Q.    **WAIVER**

The **Insurer's** failure to insist on strict compliance with any terms, provisions or conditions to coverage of this Policy or the failure to exercise any right or privilege shall not operate or be construed as a waiver thereof or of any subsequent breach thereof or a waiver of any other terms, provisions, conditions, privileges or rights.

R.    **ENTIRE AGREEMENT**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** or any of its agents relating to this insurance.

S.    **HEADINGS**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form not part of the terms and conditions of coverage.

# EXHIBIT 2

THIS IS NOT AN ARBITRATION CASE.
ASSESSMENT OF DAMAGES HEARING IS
REQUIRED.
JURY TRIAL IS DEMANDED.

Filed and Attested by the
Office of Judicial Records
08 FEB 2016 12:53 pm
C. FORTE

COHN & ASSOCIATES
By: Clifford B. Cohn, Esquire
Identification No.: 25847
926 Public Ledger Building 620
Chestnut Street
Philadelphia, PA 19103
Telephone No. (215) 545-9660
e-mail: cbcohn@cbcohn.com

**Attorney for Plaintiff, John Ferguson**

| | |
|---|---|
| JOHN FERGUSON | : COURT OF COMMON PLEAS |
| | PHILADELPHIA COUNTY |
| v. | : |
| LINDA J. STENGLE, ESQUIRE, INDIVIDUALLY | : NO. 150302491 |
| STENGLE LAW | |
| THE ARRAS GROUP, INC., AND ROBERT MADSEN | : |

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Reference Service
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 238-1701**

## AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificion hace falta a sentar una comparencia escrita o en persona o con un adogado y entregar a la corte en forma escrita sus defensa o sus objeciones a las de mandas en contra de su persona. Sea a visado que si usted no se defiende, la corte tomara medidas y puede continuar la de manda en contra suya sin previo aviso o notoficacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades o otros de rechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADOINME DIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIS LEGAL.

**Servicio de Referencia Legal
Uno Reading Centro 11th Floor
Filadelfia, PA 19107
Telefono 238-1701**

## I.    INTRODUCTION
### Bank of America Enters into An $18 Billion Dollar Settlement

This case arises from Defendant Attorney's representation of Plaintiff in whistle blowing cases under the False Claims Act that resulted in Defendant, Madsen, recovering $56 Million in whistle blower awards.

Defendant Attorney's former firm and Plaintiff entered into a Fee Agreement for the purposes of pursuing Qui Tam litigation involving mortgage fraud against Bank of America (BOA), Countrywide Financial (CF), and others.  The plaintiff was instrumental in advising Defendant Attorneys about the scheme, the illegal acts of both of the companies and providing information necessary to file a complaint. Defendant Attorneys requested Plaintiff recruit other individuals specifically familiar with the activities of BOA and CF to strengthen his case. Plaintiff did so and was told by Defendant Attorney that he "was part of the client team." Defendant Attorney and Defendant Madsen, then conspired to deprive Plaintiff Ferguson of his fair share of whistle blower awards recoverable under the law.

Defendant Attorneys abandoned Plaintiff like a hot potato and pursued the Qui Tam litigation solely with Defendant Madsen. Defendant Attorneys promised Plaintiff, in writing, that he would receive his share out of the attorney fees generated in the case. Eventually, the Department of Justice pursued the complaint. BOA and CF settled the matter with the Department of Justice for $18 billion and Defendant Madsen received a whistle blowers award in excess of $56 million. Attorneys' fee of $17 million were awarded. To date, the Plaintiff has not been compensated.

## II.    PARTIES

1.    Plaintiff, John Ferguson, is an adult individual currently residing at 859 Jones Rd., #17, Yuba City, CA  95991.

2.      Defendant Linda Stengle, Esquire (Stengle), is a licensed attorney, now practicing law at Stengle Law, located at 9 Lenswood Drive, Boyertown, PA 19512 and was at times relevant, and employer and employee of her former firm, which maintained an office at 8 Penn Ctr., Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103.

3.      Defendant Stengle Law is an unknown business entity, owned by Linda Stengle, engaged in the practice of law, with offices located at 9 Lenswood Drive, Boyertown, PA 19512.

4.      Defendant The Arras Group, Inc. is an unknown business entity, owned by Linda Stengle, engaged in the practice of law, with offices located at 9 Lenswood Drive, Boyertown, PA 19512.

5.      At all times relevant hereto, Defendant Stengle was first an attorney at the former law firm and then at her present position with Stengle Law and Arras Group, Inc.

6.      At all times relevant while employed at Defendant Attorney's former firm, Defendant Stengle was acting within the course and scope of her employment.

7.      Plaintiff is asserting a professional liability claim against all named "Attorney Defendants", which includes all Defendants other than Defendant Madsen.

8.      Defendant Robert Madsen is an individual who resides at 11698 Myrna Dr. , Grass Valley, CA 95945.  At all times relevant, he was represented by Attorney Defendants' and Defendant Stengle's former firm.

## III.     <u>JOHN FERGUSON WAS INSTRUMENTAL IN BRINGING AN ACTION AGAINST BANK OF AMERICA AND COUNTRYWIDE FINANCIAL</u>

9.      Plaintiff Ferguson has had a long history in banking and real estate appraising since 1986.

10.     From 2005 through 2010, Plaintiff had established a national reputation as a real estate appraiser and consulted on a book regarding real estate appraising.

11.     Plaintiff Ferguson has certificates and licenses recognized by the appraisal industry.

12.     Plaintiff Ferguson has more than 25 years of experience in the real estate valuation industry, including working as a bank appraiser and forensic review appraiser.

13.     Plaintiff's first contact with Defendant Stengle came on or about November 8, 2010, when he met Defendant Stengle, who was then employed by her former firm, on a whistle blower LinkedIn site.

14.     Plaintiff's professional relationship with Defendant Stengle, acting in her capacity as an employee of her former firm, grew as she decided to use the False Claims Act to target financial institutions that were responsible for the financial crises that beset the United States in 2008.

15.     During this period, Defendant Stengle, on behalf of her former firm, requested that the Plaintiff prepare a roadmap on how to pursue the financial institutions through the use of the False Claims Act ("The Ferguson Plan").

16.     Pursuant to the above request, Plaintiff immediately prepared a working model on the course of potential litigation and delivered The Ferguson Plan to Defendant Stengle. See Exhibit L.

17.     This was just the first of many, many documents prepared by Ferguson, to aid Defendant Attorney and Defendant Attorney's former firm, in bringing the Bank of America litigation.

18.     Plaintiff advised Defendant Stengle on the underlying basis of the appraisal fraud committed by BOA and CF, sufficient to bring a claim against the companies.

19.     On or about December 2, 2010, Defendant Stengle told Plaintiff that clients with firsthand knowledge were needed to fill in the gaps of the proposed Ferguson Plan in order to successfully institute litigation against BOA and CF under the False Claims Act.

20.     On or about December 14, 2010, Defendant Stengle sent an email, attached as Exhibit A, through her former firm's systems, complimenting Plaintiff on his networking skills, and further stated that she is

>    Very much in need of your excellent and patient tutelage.

>    I am excited about this ring of folks you have put together. Let's make it rewarding **- monetarily** and morally (emphasis added)

21.     On or about December 14, 2010, Defendant Stengle sent another email, through her former firm's system, to Plaintiff, indicating that Ferguson should be sending emails to potential clients and stated, "that way it would be clear to everyone that you are part of the client team".   A copy of said email is attached as Exhibit B.

22.     On or about December 27, 2010, based on Defendant Stengle's representations, Plaintiff executed a Retainer Agreement with Defendant Attorney's former firm.   The Agreement is attached as Exhibit C.

23.     The Retainer Agreement provided that Plaintiff retained Defendant Stengle's former firm to prosecute any and all claims on behalf of the clients pursuant to the provisions of the False Claims Act.

24.     On or about February 10, 2011, at the request of the Defendant Stengle, and with the intent of procuring additional clients, the Plaintiff and Defendant Stengle did an interview for the Appraisal Buzz Blog, which was published on March 21, 2011.

25.     During the interview, Defendant Stengle stated the following;

>    "John Ferguson tracked me down through LinkedIn because I had been posting information about how I would never recommend an internal compliance reporting mechanism. He told me about some of his experiences, and the two of us quickly realized that this was a great relationship. John's a very experienced appraiser, and I know my stuff. The two of us just began noodling out the theories and how the appraisal situation could possibly fit into a false claims action."

When asked as to whom potential clients should contact, Defendant Stengle stated

> "OMG, call me, or call John Ferguson before filing anything online. That SEC online website complaint form is a nightmare! Don't even get me started. Call me at xxx xxx-xxxx or email me at lstengle@XXX.com. Or, contact John Ferguson at xxxx xxxxx xxxxxxx or (xxx) xxx-xxxx. Even if I don't take the case, call me anyway. I can give some easy tips that will help someone who is courageous enough to try to file a claim on their own."

The interview is attached as Exhibit D.

26. That very day, on March 21, 2011, Plaintiff received a telephone call from Defendant Madsen, who performed real estate appraisals for BOA and CF and was interested in becoming a Relator ("Whistleblower") in a lawsuit against BOA and CF.

27. During that phone call Plaintiff advised Defendant Madsen of his attorney-client relationship with Defendant Stengle and her former firm, recommended the attorneys as excellent attorneys, indicated that the attorneys would be willing to work on a contingent basis, indicated that he would make the introduction, and work with Madsen, Defendant Stengle and her former firm, in return for being a co-relator.

28. Defendant Madsen indicated that he had lawyers working on an SEC action, but that he was looking for new counsel.

29. Defendant Madsen agreed that he would speak to Defendant Stengle and agreed that if he decided to retain Defendants, that Ferguson would be a co-relator.

30. The essence of that conversation is memorialized in an email of March 21, 2011 attached as Exhibit E. It states,

> "Call me if you can XXX-XXX-XXXX. I spoke with Bob Madson (sic) (appraiser) he is looking for an attorney to file a claim against Landsafe (sic) which is the AMC that bank America(sic) owns. This could be huge. Call him or we can do a conf call tomorrow. His number is XXX-XXX-XXXX"

31.     On or about March 22, 2011, Defendant Stengle communicated with Madsen, agreed to represent him on behalf of her former firm and had him sign a Retainer Agreement.

32.     At this time Defendant Stengle agreed with Defendant Madsen, to drop Plaintiff Ferguson as a client, and deprive him of his status as a co-relator.

33.     On or about March 23, 2011, Defendant Stengle sent an email, through The Firm's email system, disclosing Madsen's attorney client privileged communications, advising Plaintiff that Madsen was negotiating the attorneys' fees. In response to Ferguson's question of what happened, attached as Exhibit E, Defendant Attorney Stengle stated,

> "It went well he wants me to woo him at 30% contingency. His other lawyers are only talking in SEC action. I have to talk to my lead partner about the reduced fee and see what we can do."

34.     As part of the conspiracy, Defendants improperly agreed that Plaintiff would not be involved with the BOA/CF lawsuit as a relator, and thus would not be entitled to share in the whistleblower awards.

35.     On or about March 23, 2011, as a means of pacifying the Plaintiff for not being a co-relator, Defendants conspired to share Defendants Attorneys' fees with Plaintiff in replacement of the relator fees that Ferguson was entitled to. See email attached as Exhibit F. The email stated,

> "Madsen is going to sign. He is not willing to have you named as a relator, **so we are going to have to work this in the form of you getting a percentage of my take on the case.**" (Emphasis added)

> "Madsen, XXX[1] and I are fussing about some related representation issues – OREA stuff, but the bottom line is we're going to sign him for the SEC claim and the FCA filings.

> Where are we at with the Mann narrative? I have a meeting on that in a few hours."

---

[1] Her former partner.

36.     On or about March 28, 2011, Defendant Stengle, confirming the arrangement to compensate Ferguson, sent an email to Plaintiff, through Defendant Attorney's former firm's system in which she stated,

> "There is no question you and I discussed the matter through. I am happy to have this email serve as a confirmation of that, if you are worried that I will get some sort of amnesia..."

A copy of the email is attached as Exhibit G.

37.     This email confirmed to Plaintiff that he would be receiving his share of relator fees out of any attorney fees generated as a result of the Qui Tam lawsuit involving Defendant Robert Madsen.

38.     On or about June 21, 2011, as a result of information and background provided by both Ferguson and Madsen, the complaint, naming Robert Madsen as Plaintiff and Linda Stengle as counsel, was filed against BOA and CF, in the U.S. District Court, Southern District of New York.  ("The Bank of America Action")

39.     The information, experience and direct knowledge of the real estate appraisal business, provided by Ferguson were factors in the United States determination to proceed with this matter.

40.     Over the ensuing months, Plaintiff had numerous conversations with Defendant Stengle regarding his compensation from The Bank of America Action.

41.     Defendant Stengle continuously reassured Plaintiff that their agreement was binding.

42.     Plaintiff relied on the fact that he was either being represented as a co-relator or going to be compensated as one by Defendant Stengle and her former firm in all false claim matters in which he had provided information and obtained other resources for Defendant Attorneys.

43.     On or about October 18, 2011, Plaintiff was advised by Defendant Stengle that she was leaving her current employment with her former firm.

44. Over the ensuing 12 months, Attorney Defendants intentionally ignored communications from Plaintiff, despite their ongoing representation of Plaintiff.

45. On or about November 15, 2012, Plaintiff had a conversation with Defendant Stengle in which he asked her whether The Bank of America Action was still active.

46. Despite her continuing representation of Plaintiff, in this matter and other matters, Defendant Stengle intentionally lied to Plaintiff and informed him that the case with Madsen was not active and that there was no recovery.

47. Notwithstanding Attorney Defendants lack of communication with Plaintiff, Plaintiff reasonably relied on the fact that he was still being represented by Attorney Defendants in his efforts to obtain whistle blower awards in The Bank of America Action.

48. Notwithstanding Attorney Defendants lack of communication with Plaintiff, he understood that he would receive compensation for his role in bringing about The Bank of America Action, if it were successful.

49. As a result of negotiations with the U.S. Department of Justice, BOA agreed to pay over $17 billion as settlement of multiple claims in The Bank of America Action.

50. Plaintiff had no knowledge of any settlement as The Bank of America Action had been previously ordered sealed by the presiding judge and was not opened until December, 2014.

51. On December 18, 2014, the New York Times published an article that indicated that Robert Madsen was one of four whistleblowers in the federal government's $17 billion civil settlement with Bank of America. That article and subsequent articles published in both the New York Times and the Wall Street Journal dated December 17, 2014 and December 19, 2014 indicated that there was a $56 million payment to Defendant Madsen for his role as a relator. See Exhibit H, Exhibit I, and Exhibit J.

52. The articles quoted the complaints that were filed, stating there were "improper appraisal practices" and entities "overstated the value", virtually parroting the initial Ferguson roadmap which stated, "I have tons of examples of appraisal fraud"… "Every time I found a file like that they always use the appraisal with the higher value".

53. A careful analysis of the complaints filed in The Bank of America Action, when compared with the information provided by Ferguson, and with the complaints in actions which preceded The Bank of America Action, where Defendant Attorneys admittedly represented Ferguson, demonstrates a remarkable resemblance.

54. An analysis of the complaints and Ferguson's work product demonstrate that Ferguson made a substantial contribution to the recovery of $58 million.

55. The Attorneys representing Madsen received an attorneys' fee of approximately $19 million.

56. Although Plaintiff was promised a percentage of the attorney fee generated in The Bank of America Action, it is standard industry practice for relators to equally share in the whistle blower award.

57. In this particular instance, had Defendant Attorneys adequately and reasonably represented Plaintiff, Plaintiff's share in the award would have been $28 million.

<u>COUNT I</u>
**Professional Negligence/Attorney Defendants**

58. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

59. Attorney Defendant Stengle acting on behalf of her former firm and herself or through her agents, employees or assigns were negligent in a variety of ways including, but not limited to, the following:

(a)    Failing to properly pursue a claim on behalf of Plaintiff.

(b)    Failing to provide appropriate and necessary legal advice to Plaintiff.

(c)    Failing to adequately represent Plaintiff.

(d)    Failing to properly communicate with Plaintiff.

(e)    Actively engaging in a conflict of interest, representing multiple clients adversely situated.

(f)    Improperly entering into a business transaction with a client.

(g)    Dropping a current client, in favor of a new client, for financial gain.

(h)    Using information obtained from one client to the benefit of another client without permission.

(i)    Failing to compensate Plaintiff for his participation in The Bank of America Action despite promises to the contrary.

(j)    Misrepresenting Plaintiff's status to Plaintiff as his being "the client team" for all False Claim Act lawsuits.

(k)    Intentionally misrepresenting the status of The Bank of America Action as having no recovery despite their direct knowledge to the contrary.

(l)    Being otherwise careless and negligent.

60.    As set forth above and at all times material, Defendant Stengle failed to possess and /or exercise the ordinary skill, knowledge and care normally possessed and exercised by members in good standing in the legal profession.

6l.    As a direct and proximate result of Defendant Attorney's negligence, carelessness, recklessness and misrepresentations, Plaintiff suffered actual monetary loss, including, but not limited to, recovery of relator fees awarded by the government in the Bank of America action.

**WHEREFORE**, Plaintiff demands judgment in his favor and against all named Defendants, individually, jointly and severally, in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

### COUNT II
**Breach of Contract/Attorney Defendants**

62.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

63.    Plaintiff, Defendant Stengle and Defendant Stengle's former firm, entered into a valid binding contract to provide legal services.  See Exhibit C.

64.    The Agreement provided that the Defendants were retained

to prosecute any and all claims on behalf of the clients pursuant to the provisions of the Federal False Claims Act.  See Exhibit C.

65.    Defendant Stengle breached and otherwise failed to perform their duties and obligations under the contract in a multitude of ways including but not limited to those set forth previously.

66.    Plaintiff reasonably relied on Defendant Stengle's numerous promises, written and oral, that Plaintiff would be part of the client team on all False Claim Act cases in which he actively participated.

67.    Despite Defendant Stengle's written and oral promises relating to compensation, Plaintiff has never received any monies from The Bank of America Action.

68.    Defendant Stengle's conduct constitutes a breach of the contract entered into between Plaintiff and Defendant Stengle and Defendant Stengle's former firm as a matter of law, as well as a violation of the covenants of good faith, fair dealing and fair representation.

69.    As a direct and proximate result of the aforesaid breach of the agreement, Plaintiff has suffered damages in the amount of $28 million.

**WHEREFORE**, Plaintiff demands judgment in his favor and against all named Attorney Defendants, individually, jointly and severally, in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees.

<div align="center">

**COUNT III**
**Breach of Fiduciary Duty/Attorney Defendants**

</div>

70.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

71.    Plaintiff and all Defendant Attorneys were in a fiduciary relationship.

72.    These fiduciary responsibilities and duties form the foundation of the attorney/client relationship.

73.    Defendant Attorneys' conduct constitutes a breach of that fiduciary relationship.

74.    As a direct and proximate result of the aforesaid breach of fiduciary duty, Plaintiff has suffered monetary damage as set forth above.

75.    Defendants breaching of their fiduciary duty to Plaintiff, was so reckless, egregious and with malice, that punitive damages are justified.

**WHEREFORE,** Plaintiff demands judgment in his favor and against all named Defendants, individually, jointly and severally, in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

<div align="center">

**COUNT IV**
**Civil Conspiracy/All Defendants**

</div>

76.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

77.    As part of an ongoing conspiracy, Defendants agreed to commit various acts to prevent John Ferguson from recovering relator fees in the Bank of America litigation.

78. The acts of the conspiracy continued from 2011 through December 2014 when funds were paid by the United States government to Defendants.

79. Defendants continue to conspire together to prevent Plaintiff from recovering funds which are rightfully his.

80. As a direct and proximate result of the aforesaid breach of fiduciary duty, Plaintiff has suffered monetary damage as set forth above.

81. Defendants' conspiracy to deprive Plaintiff of the rights of the attorney-client relationship and rights to recovery was so reckless, egregious, and with malice, that punitive damages are justified.

**WHEREFORE,** Plaintiff demands judgment in his favor and against all named Defendants, individually, jointly and severally, in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

## COUNT V
### Breach of Contract/Madsen

82. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

83. Plaintiff alleges that there was an enforceable contract, even if not reduced to writing.

84. Defendant Madsen and Plaintiff agreed that they would be co-relators in any litigation against Bank of America.

85. Both individuals agreed that they would provide Defendant Stengle with critical information allowing her to proceed against Bank of America and other defendants in the Qui Tam litigation.

86. Defendant Madsen breached this agreement by conspiring with Defendant Stengle to 'drop' Plaintiff as a party, and refusing to share any recovery with Plaintiff.

87.     Plaintiff, John Ferguson has unfairly suffered monetary damages as previously set forth.

**WHEREFORE**, Plaintiff demands judgment against Defendant Madsen in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

## COUNT VI
### Quasi Contract/Madsen

88.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

89.     Plaintiff alleges that there was an understanding between him and Defendant Madsen that they would both be co-relators in any litigation against Bank of America and other defendants.

90.     Madsen breached this agreement by insisting that Plaintiff not be a part of The Bank of America Action.

91.     There is an absence of an express written agreement whereby Plaintiff and Madsen agree to be co-relators in the Bank of America Action.

92.     Plaintiff, John Ferguson has unfairly suffered monetary damages as previously set forth.

**WHEREFORE**, Plaintiff demands judgment against Defendant Madsen in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

## COUNT VII
### Fraud/ Defendant Attorneys

93.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

94.     At all times relevant hereto, Defendant Stengle was an employee, agent, and worker for Defendant Attorney's former firm, and for the other defendant entities.

95.     At all times relevant hereto, Defendant Stengle clearly misrepresented to Plaintiff that Plaintiff would be a co-relator in the BOA case.

96.     The writings, actions, statements, etc. of Defendant Stengle were within the scope of her employment and/or authority.

97.     Defendant Stengle and her related entities are liable to Plaintiff for damages caused to Plaintiff due to her misrepresentation to Plaintiff that he was part of The Bank of America Action, or in the alternative, that he would receive a relator's share or a share of the attorneys' fees awarded in the case.

98.     Plaintiff, John Ferguson, has unfairly suffered monetary damages as previously set forth.

        **WHEREFORE**, Plaintiff demands judgment against all named attorney defendants and firms in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

## <u>COUNT VIII</u>
### Intentional Interference With Contractual Relations/Madsen/Stengle

99.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

100.    At all times relevant, Defendants Stengle and her former firm, pursuant to an executed Agreement, represented Plaintiff for all Qui Tam lawsuits arising out of residential and commercial appraisal fraud.

101.    At the time that Defendant Madsen entered into an attorney/client relationship with Attorney Defendants, he was well aware that Plaintiff was represented by Attorney Defendant Stengle and Defendant Stengle's former firm.

102.    Despite the forgoing, Defendant Madsen and Defendant Stengle conspired to interfere with Plaintiff's attorney/client relationship and 'force' him out of the BOA Qui Tam lawsuit.

103.    At the time this occurred, Defendants Madsen and Stengle possessed no privilege or justification for said interference.

104. Solely as a result of this interference, Plaintiff unfairly sustained monetary damages as previously set forth.

**WHEREFORE**, Plaintiff demands judgment against Defendant Madsen in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

## COUNT IX
### Unjust Enrichment/All Defendants

105. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

106. Plaintiff supplied to Defendant Stengle critical information regarding fraudulent appraisal actions which substantially formed the basis of the Qui Tam litigation against BOA.

107. Defendant Stengle, as previously set forth, relied on Plaintiffs' information, experience and reputation in determining that a cause of action existed against BOA, in acquiring Defendant Madsen as a client, in formulating the complaint against BOA, in moving forward with a complaint and in having the United States decide to pursue The Bank of America Action.

108. Plaintiff conferred these benefits upon Defendant Stengle and Defendant Madsen which were accepted and appreciated by Stengle as evidenced in her emails previously exhibited.

109. Said benefits were conferred upon Defendant Stengle and Defendant Madsen by Plaintiff with the clear understanding that Plaintiff would be a co-relator or receive the equivalent fees of a co-relator in The Bank of America Action.

110. Plaintiff never received any compensation for his role in The Bank of America Action.

111. Defendant Madsen, as a relator in The Bank of America Action, received $56 million dollars.

112. Defendants Stengle and her former firm received approximately $19 million dollars in attorney fees.

113.    Plaintiff never received any compensation whatsoever for his contributions.

114.    The acceptance and retention of the benefits provided by Plaintiff under these circumstances make it inequitable for Defendants to retain all of their awards without payment of value to Plaintiff Ferguson.

**WHEREFORE,** Plaintiff demands judgment against all named defendants in an amount in excess of $50,000.00, together with interest and costs and such other relief as this Honorable Court deems necessary and just, including attorneys fees, along with punitive damages.

**COHN & ASSOCIATES**

**BY:**    /s/ "SIGNATURE ON FILE"
**CLIFFORD B. COHN, ESQUIRE**
**ATTORNEY FOR PLAINTIFF**

Date:   February 8, 2015

**VERIFICATION**

I, Clifford B. Cohn, due to the unavailability of Plaintiff, John Ferguson, being duly sworn according to law, hereby state that I am the Attorney for Plaintiff in the within matter, and verify that the foregoing Complaint is true and correct to the best of my knowledge, information and belief. I also understand that the statements are made subject to the penalties of 18 Pa. C.S.A Section 4904 relating to unsworn falsification to authorities.

**COHN & ASSOCIATES**

**BY:** /s/ "SIGNATURE ON FILE"
**CLIFFORD B. COHN, ESQUIRE**
**ATTORNEY FOR PLAINTIFF**

Date: February 8, 2016

Case ID: 150302491

<u>**CERTIFICATE OF SERVICE**</u>

I, Clifford B. Cohn, Esquire, hereby certify that I caused a true and correct copy of the foregoing to be electronically filed and the following are hereby notified pursuant to Philadelphia County Court of Common Pleas electronic court filing system.

David Kraut, Esquire
Kraut Harris, P.C.
VIST Financial Building
1767 Sentry Parkway West, Suite 311
Blue Bell, PA   19422
Email:dkraut@krautharris.com
*Counsel for Robert Madsen*

Chris J. Trebatoski, Esquire
Law Offices of Chris J. Trebatoski, LLC
1101 North Old World
Third Street, Suite 202
Milwaukee, Wisconsin 53203
Email:  cjt@treblaw.com
*Counsel for Robert Madsen*

Kathryn L. Simpson, Esquire
Mette, Evans & Woodside
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
Email: klsimpson@mette.com
*Counsel for Linda Stengle, Stengle Law and  The Arras Group, Inc.*

**COHN & ASSOCIATES**

**BY:**    /s/ "SIGNATURE ON FILE"
           **CLIFFORD B. COHN, ESQUIRE**
           **ATTORNEY FOR PLAINTIFF**

Date:   February 8, 2015



Filed and Attested by the
Office of Judicial Records
08 FEB 2016 12:53 pm
C. FORTE

# Exhibit A

———— Original Message ————
From: "Linda J. Stengle" <LStengle@███████████.com>
To: "John Ferguson" <john_ferguson2002@netzero.com>
Subject: RE: False Claims Act - miscellaneous articles
Date: Tue, 14 Dec 2010 13:39:50 -0500


A compliment!  Don't you know you aren't supposed to compliment attorneys!  :)

Thanks.  I do feel like I am getting a grasp on the industry and its problems - at least enough to have a conversation on the topic.  Very much in need of your excellent and patient tutelage.

I am excited about this ring of folks you have put together.  Let's make it rewarding - monetarily and morally.

L

Linda J. Stengle, Esq., CFS
████ █████████████ PC
3031 Walton Road
Suite 202C
Plymouth Meeting, PA 19462
Email: Lstengle@███████████com
Phone number: (610) 940-0327
Direct Line: (610) 862-7214
*Admitted in PA, NJ, NY, and US Tax Court*

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain confidential information belonging to the sender, which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution (electronic or otherwise), forwarding or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this electronic transmission in error, please immediately notify us by telephone, facsimile, or e-mail to LStengle@███████████com to arrange for return of the electronic email, attachments, or documents.

————————————————————————————————————————

**From:** John Ferguson [mailto:john_ferguson2002@netzero.com]
**Sent:** Tuesday, December 14, 2010 1:35 PM
**To:** Linda J. Stengle
**Subject:** RE: False Claims Act - miscellaneous articles
Thanks again you do a beautiful job of explaining your end of this. It also sounds like you are getting what we have been talking about.

I hope you don't have anything too serious going on if you want to talk about it I'm here for ya;-)

John

———— Original Message ————
From: "Linda J. Stengle" <LStengle@███████████com>
To: "John Ferguson" <john_ferguson2002@netzero.com>
Subject: RE: False Claims Act - miscellaneous articles
Date: Tue, 14 Dec 2010 11:31:47 -0500


Joan just called, and we scheduled a call to include you one hour from now. I am going to call you and then conference her in.

Case ID: 150302491

**Exhibit B**

Case ID: 150302491

3031 Walton Road
Suite 202C
Plymouth Meeting, PA 19462
Email: Lstengle@███████████com
Phone number: (610) 940-0327
Direct Line: (610) 862-7214
*Admitted in PA, NJ, NY, and US Tax Court*

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain confidential information belonging to the sender, which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution (electronic or otherwise), forwarding or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this electronic transmission in error, please immediately notify us by telephone, facsimile, or e-mail to LStengle@███████████com to arrange for return of the electronic email, attachments, or documents.

---

**From:** John Ferguson [mailto:john_ferguson2002@netzero.com]
**Sent:** Tuesday, December 14, 2010 11:05 AM
**To:** Linda J. Stengle
**Subject:** RE: False Claims Act - miscellaneous articles
Ok will do.

---------- Original Message ----------
From: "Linda J. Stengle" <LStengle@███████████com>
To: "John Ferguson" <john_ferguson2002@netzero.com>
Subject: RE: False Claims Act - miscellaneous articles
Date: Tue, 14 Dec 2010 11:02:02 -0500

Yes. There are just those attorney client rules that I have to be mindful of.

It might be more clear if you just send an email from you and the other person and ask for the call. That way it would be clear to everyone that you are part of the client team.

L

Linda J. Stengle, Esq., CFS
████████████ PC
3031 Walton Road
Suite 202C
Plymouth Meeting, PA 19462
Email: Lstengle@███████████com
Phone number: (610) 940-0327
Direct Line: (610) 862-7214
*Admitted in PA, NJ, NY, and US Tax Court*

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain confidential information belonging to the sender, which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution (electronic or otherwise), forwarding or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this electronic transmission in error, please immediately notify us by telephone, facsimile, or e-mail to LStengle@███████████com to arrange for return of the electronic email, attachments, or documents.

---

**From:** John Ferguson [mailto:john_ferguson2002@netzero.com]
**Sent:** Tuesday, December 14, 2010 11:00 AM
**To:** Linda J. Stengle
**Subject:** RE: False Claims Act - miscellaneous articles
Don't you think it's helpful when I'm on the call?

--------- Original Message ----------
From: "Linda J. Stengle" <LStengle@███████████com>
To: "John Ferguson" <john_ferguson2002@netzero.net>

Case ID: 150302491

**Exhibit C**

Case ID: 150302491



1787 Sentry Parkway West
Building 18, Suite 410
Blue Bell, PA 19422
Phone: (215) 367-4333
Fax: (215) 367-4335

March 18, 2011

John Ferguson
PO Box 816
Wheatland, CA 95692

Dear Mr. Ferguson:

Enclosed please find a fully executed copy of the Retainer Agreement with ████ █████████ PC for your files. Please don't hesitate to contact us if you have any questions.

Very truly yours,

Kristina L. Hinde

Enclosure

Case ID: 150302491

PRIVILEGED AND CONFIDENTIAL

## RETAINER AGREEMENT
### False Claims Actions

George Mann and John Ferguson (hereinafter "Client") hereby agree to retain as Clients' attorneys ████████ ████████ P.C., (hereinafter "Counsel") to prosecute any and all claims on behalf of the Clients pursuant to the provisions of the Federal False Claims Act (31 U.S.C. S 3729, et seq) ("FCA") and all applicable state qui tam statutes.

      A.     Clients authorize Counsel to associate and/or consult with any other counsel as Counsel deems necessary. Notwithstanding any such association of other counsel, and unless such authority is expressly delegated in writing by Counsel to other counsel with the consent of the Clients, Counsel shall at all times retain the full authority and responsibility of lead counsel in any litigation pursuant to this Retainer Agreement. Moreover, unless otherwise agreed to by Clients and Counsel, Counsel shall be responsible for compensating any other counsel with whom Counsel associates or consults.

      B.     Clients understand that this Retainer Agreement is limited to Counsel's representation of Relators in the False Claims Act Lawsuit "(Lawsuit"). Such representation is limited to (1) pursuing certain qui tam claims on behalf of the Federal Government and Relatosr, and (2) determining the Relators' Share (as defined below) of any award or settlement. Counsel does not represent Relators in any other proposed or actual litigation, unless representation is offered by the firm via a separate and new Retainer Agreement.

      C.     Clients understand that Counsel does not and cannot represent Clients in connection with the negotiation of this Retainer Agreement. Rather, Counsel is acting on its own behalf, and Clients are entitled to review this Retainer Agreement with independent

Case ID: 150302491

counsel. Moreover, in the event of recovery from this action, Clients may want to confer with independent and knowledgeable tax counsel on such issues as personal income tax obligations and accounting practices.

        D.     Clients understand that qui tam claims in the Lawsuit will be prosecuted on behalf of the United States and appropriate state and municipal governments, as well as Clients. Clients further understand that if the Government exercises its statutory right to take control over the Lawsuit, the Government's lawyers will act as lead counsel in the Lawsuit. Clients also understand that, because qui tam claims are claims belonging to the Government, the Government has the right, with the approval of the court after a hearing of any objections raised by the Clients, to settle its claims in the Lawsuit without Clients' ultimate consent.

        E.     Clients agree to pay for any travel and lodging expenses for any travel that the Clients may be required to undertake to meet with prosecutors, to review documents, to testify at hearings and in trial, etc. Client will not be obligated to pay any travel or other expenses for Counsel.

        F.     Clients understand that the Lawsuit will remain under seal while the Federal Government investigates Clients' allegations. For as long as the Lawsuit is under seal, Clients understand that Clients are precluded by law from discussing the substance or existence of the Lawsuit with any third party, which may include, but is not limited to, all members of the press. Clients agree to maintain the absolute confidentiality of all discussions and written and oral communications with Counsel.

        G.     Counsel and Clients understand and agree that Counsel's fee is contingent, meaning that Counsel shall be paid Counsel's fees only if there is a recovery from the lawsuit.



Case ID: 150302491

Counsel and Clients understand and agree that Clients shall not be obligated to pay or to guarantee payment of any compensation to Counsel for services rendered or costs and expenses incurred by Counsel or its associated or consulting counsel in the Lawsuit other than as set forth in this Retainer Agreement.

H. Clients understand that in the event of a settlement or judgment on a qui tam claim, qui tam plaintiffs such as Clients may be entitled to a portion of the damages and penalties awarded to the Federal Government (the "Relator Share"). The potential range of the Relator Share can be anywhere from 0 to 25%. In addition, the FCA allows the court to award of costs, expert fees, expenses, and/or attorneys' fees (collectively "Statutory Fee and Expense Awards") from the defendant(s). Statutory Fee and Expense Awards include compensation at reasonable hourly rates for the time expended by knowledgeable qui tam Counsel and any other attorneys associated with them in furtherance of the lawsuit.

I. Clients agree to pay Counsel a Contingent Fee of forty percent (40%) of the Relator's Share (the "Contingent Fee"), through the resolution of this matter.

J If an appeal or appeals need to be taken to the appropriate Court of Appeals, the Contingent Fee portion of the recovery shall remain forty percent (40%) of the Clients' recovery from the proceeds of the action or settlement of the claim.

K. To the extent that Counsel's statutory fees, costs, and expenses are awarded by the court or recovered through settlement, Counsel retains 100% of the award for such fees, cost, and expenses.

L. If Counsel submits a Statutory Fee and Expense Awards application to the court, and the court denies some portion of the application or reduces Counsel' normal hourly



Case ID: 150302491

rates, Clients shall have no obligation to make up the difference of any such shortfall in the absence of a written agreement otherwise. Likewise, to the extent that, as part of any settlement agreement with defendant(s), Counsel agrees to waive any portion of its statutory fees, costs, or expenses, Clients shall have no obligation to Counsel with regard to the amounts so waived in the absence of a written agreement otherwise. Counsel shall not be required to waive any portion of its fees, costs, or expenses as part of a settlement.

M.    Clients agree, however, if for any reason Clients elect, without the written approval of Counsel, to compromise or waive the Statutory Fee and Expense Awards, or refuses to seek such awards, Clients shall reimburse Counsel for the amount of such fees, costs, and expenses from Clients' share of any recovery in the lawsuit or Lawsuits.

N.    Clients understand that, in light of Counsel's interest in the Statutory Fee and Expense Award, in any qui tam award, it is possible that a conflict could arise between the Clients' interest and the interests of Counsel. To prevent such a conflict from arising, Counsel will not negotiate or seek to resolve its claims to statutory fees, costs, and expenses until an agreement in principle has been reached regarding the substantive qui tam claims with respect to which such fee costs and expense claims relate. Clients agree to assist, however, wherever Clients can, Counsel in recovering Statutory Fees and Expenses.

O.    Clients understand that, under current federal legal standards, if a defendant prevails in a lawsuit such as is contemplated here, defendant may seek to recover costs and/or expenses from the Clients. Clients also understand that, under current legal standards, if a defendant prevails in the lawsuit and demonstrates that the lawsuit was clearly frivolous or vexatious or was filed to harass or oppress a defendant, such defendant may also recover



Case ID: 150302491

attorneys' fees from the Clients, in addition to defendant's costs and expenses. Clients and Counsel agree that, in their best judgment, the Lawsuit contemplated herein is meritorious, not frivolous or vexatious, and that it is not filed to harass or oppress any defendant. Clients understand and agree that Clients are legally responsible for payment of any costs, expenses, or attorneys' fees recovered by defendants.

P.    Clients agree that pursuant to 31 U.S. C. Sec 3730 et seq certain jurisdictional bars exist in the federal and state qui tam statutes, which may or could preclude the Clients from recovering some, any or all proceeds from any recovery.

Q.    Clients may discharge Counsel at any time by thirty (30) days written notice to Counsel.

R.    If Counsel withdraws or is discharged by Clients and Clients proceed with the lawsuit with or without substitute counsel, and Clients or substitute counsel receives a Statutory Fee and Expense Award and/or a Relator's Share Award, Counsel shall receive: (i) a portion of the Statutory Fee and Expense Awards equal to the total value of the hours expended by Counsel at their usual and customary rates plus any previously unreimbursed costs and expense Counsel reasonably paid or incurred in connection with the lawsuit, and (ii) a portion of the Relators' Share that is proportionate to the percentage of the hours expended by Counsel compared with the hours expended by substitute counsel, if any (appropriately weighted based upon experience). If provided reasonable written notice, Counsel will timely submit an accounting of all time costs and expenses for which it will seek reimbursement under clause (i) above, so that such amounts may be included in Clients' application or request to have such amounts paid by defendant(s).



Case ID: 150302491

S.     The Clients agree to maintain prompt mail and telephone contact with Counsel and to fully cooperate with the Counsel's efforts to prosecute this claim. Clients agree to notify Counsel promptly of changes in address, email address, phone number, etc.  If the Clients fail to cooperate with Counsel's efforts, Counsel reserves the right to withdraw their representation of the Clients.

T.     If Counsel determines at any time that it is no longer feasible or desirable to pursue the lawsuit, Counsel may, after providing thirty (30) days written notice to Clients, withdraw from further representation. Withdrawal with less than thirty (30) days written notice is permitted only if Counsel is required to withdraw sooner for ethical or legal reasons. Clients agree that, should Counsel elect to withdraw from this matter in accordance with this paragraph, Clients will not object to that decision to withdraw.

U.     If a claim arises as a result of an alleged dispute, and the dispute involves Counsel, Clients agree that any such claim or dispute between Clients and Counsel will be submitted to binding arbitration conducted by the Philadelphia County Bar Association, and Clients agree to be bound by any and all decisions rendered.

V.     If upon completion of its review of the case, the Government decides not to join or intervene in the lawsuit, or if it joins but subsequently seeks to be dismissed from any or all of its claims relating to Clients' portion of the case, Counsel shall not be required to move forward on this case, without a new Agreement detailing fees and payment owed to Counsel by Clients. If no new Agreement is reached, Clients shall not object in any way to Counsel's withdrawal from the case.

W.     The entire Agreement between Counsel and Clients relating to the subject

matter of this Retainer Agreement is contained herein. No promises, inducements, or considerations have been offered, accepted or given except as herein set forth. This Retainer Agreement supersedes any prior oral or written agreement concerning the subject matter of this Retainer Agreement.

X.    This Retainer Agreement may not be modified, changed, altered or amended in any way except in a writing signed by all of the Parties. The Parties expressly agree that no oral modification of this Agreement shall be effective, notwithstanding any provisions of the governing that may allow for oral modification.

Y.    Facsimiles and/or pdf copies of signatures shall constitute acceptable, binding signatures for purposes of this Agreement. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

Z.    The undersigned hereby acknowledge that they have read and fully understand the foregoing, that they have had the opportunity to consult with independent counsel, and that they agree to the representation on the terms set forth in this Retainer Agreement. The undersigned acknowledge receipt of a fully executed copy of this Agreement.

DATED: 12/24/2010          BY: _____
                                GEORGE MANN


DATED: _____    BY: _____
                                JOHN FERGUSON


DATED: 12/30/2010

Case ID: 150302491

matter of this Retainer Agreement is contained herein. No promises, inducements, or considerations have been offered, accepted or given except as herein set forth. This Retainer Agreement supersedes any prior oral or written agreement concerning the subject matter of this Retainer Agreement.

X.    This Retainer Agreement may not be modified, changed, altered or amended in any way except in a writing signed by all of the Parties. The Parties expressly agree that no oral modification of this Agreement shall be effective, notwithstanding any provisions of the governing that may allow for oral modification.

Y.    Facsimiles and/or pdf copies of signatures shall constitute acceptable, binding signatures for purposes of this Agreement. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

Z.    The undersigned hereby acknowledge that they have read and fully understand the foregoing, that they have had the opportunity to consult with independent counsel, and that they agree to the representation on the terms set forth in this Retainer Agreement. The undersigned acknowledge receipt of a fully executed copy of this Agreement.

DATED: _____        BY: _____
                                    GEORGE MANN

DATED: _12-27-2010_             BY: _____
                                    JOHN FERGUSON

DATED: _12-30-2010_             BY: _____

Case ID: 150302491

# COOPERATION AND SHARING AGREEMENT
## AMONG RELATORS

This Agreement is made among John Ferguson and George Mann (jointly referred to hereafter as "relators" or "parties").

WHEREAS, relators intend to bring claims under the federal and states False Claims Acts and, perhaps, the Whistleblower Provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, 11th Congress (2010);

WHEREAS the relators acknowledge that it is in their mutual interests to act in good faith and use their best efforts to cooperate and assist each other in the prosecution of government fraud actions;

WHEREAS the relators will be represented by ████ & ████████ ("Counsel") for purposes of the above referenced actions. The terms of the retainer agreement between Counsel and the relators are set forth in a separate agreement (the "Retainer Agreement"), the terms of which are incorporated herein by reference; and

WHEREAS each of the relators has had the opportunity to review the terms of this agreement with counsel of their choosing, independent of Counsel;

IT IS HEREBY AGREED THAT:

1.     Relators will share any financial recoveries they each may receive under federal and state False Claims Actions and/or Whistleblower Provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act arising from the above-mentioned Actions, minus attorneys' fees and costs due and owing according to the terms of the Counsel Retainer Agreement, which will

Case ID: 150302491

include a contingent fee for counsel of 40%. The relators' portion of the award will be as follows:

John Ferguson shall receive 50% of the whistleblowers' share of the award obtained, and George Mann shall receive 50% of the whistleblowers' share of the award obtained.

2.   In the event the government fails to make direct payments of an award to each of the relators calculated in accordance with this Agreement, the relators will take such actions and make such payments as may be necessary to achieve the allocations set forth in this Agreement.

3.   It is the intention of the relators that any award be shared as set forth in this Agreement even if this Agreement is challenged and/or an alternative means of apportioning entitlement to an award is reached by a court or governmental entity. In either event (and even if one of the relators is adjudged ineligible for an award), the relators will share the award in the manner set forth herein.

4.   The Parties agree to cooperate fully and truthfully in the investigation and prosecution of the above described actions. The ongoing, full, and truthful cooperation shall include, but not be limited to (a) appearing for and providing ongoing, full, and truthful cooperation for debriefing, conferences and interviews by or with any government agency, interviews, and the provision of testimony in grand jury, trial, and other proceedings in connection with the above described actions, and (b) providing all documents, records, writings, or materials of any kind in his or her possession or accessible to the relator, or under relator's care, custody, or control, including those materials in the possession of any related entity or affiliate, relating directly or indirectly to all areas of inquiry and investigation.

Case ID: 150302491

5.     The parties will cooperate with each other in connection with an award or awards of a percentage of the proceeds of any above described action.

6.     Nothing in this Agreement is intended to supersede the fee arrangements set forth in the Counsel Retainer Agreement between the relators and Counsel.

7.     The parties to this Agreement intend that this Agreement will be binding upon any and all legal counsel that the relators may retain or that the attorneys may associate with in future in connection with the above described actions.

8.     This Agreement will be binding upon, and inure to the benefit of, the respective heirs and successors of the parties hereto.

9.     The invalidity or unenforceability of any one or more provisions of this Agreement will not render any other provision herein invalid or unenforceable.

10.    The "Effective Date" of this Agreement shall be the date when the Agreement contains at least one signature from each Party.  Facsimiles and/or pdf copies of signatures shall constitute acceptable, binding signatures for purposes of this Agreement. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

11.    The Parties represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

12.    This Agreement is governed by the laws of the United States and, where federal law provides no guidance, according to the law of Pennsylvania. The Relators agree that the exclusive jurisdiction and venue for any dispute arising between and among them under this Agreement shall be the United States District Court for the Eastern District of Pennsylvania.

Case ID: 150302491

13.    This Agreement constitutes the complete Agreement between the relators concerning the subject matter of any award in the above described actions. This Agreement may not be amended except in writing, executed by all of the Parties.

_(signature)_

John Ferguson

12-27-2010
Dated

_____

George Mann

_____

Dated

-4-

Case ID: 150302491

13. This Agreement constitutes the complete Agreement between the relators concerning the subject matter of any award in the above described actions. This Agreement may not be amended except in writing, executed by all of the Parties.

_____
Alice Banks

_____
Dated

_____
John Ferguson

_12-27- 2010_
Dated

_____
Cindi Dixon

_____
Dated

-4-

Case ID: 150302491

13. This Agreement constitutes the complete Agreement between the relators concerning the subject matter of any award in the above described actions. This Agreement may not be amended except in writing, executed by all of the Parties.

_____

John Ferguson

1 L-27- 2010

Dated

_____

George Mann

_____

Dated

-4-

Case ID: 150302491

**Exhibit D**

Case ID: 150302491




E&O Experts 

(http://archive.appraisalbuzz.com/simpleads/redirect/910)

 (http://www.facebook.com/pages/Appraisal-Buzz/172238732809902)

 (https://twitter.com/appraisalbuzz) 

(http://www.linkedin.com/company/appraisal-buzz/)

(http://www.youtube.com/user/appraisalbuzz)

(http://www.flickr.com/photos/55482321@N07/)

Search 🔍

Home (/) / the Buzz (/buzz) / Features (/buzz/features) / Interview with Linda Stengle

# Interview with Linda Stengle

📅 Monday, March 21, 2011

Linda Stengle is an attorney whose practice is devoted to representing whistleblowers in government fraud claims. She is a Certified Fraud Specialist and currently focuses on bringing claims for violations of securities laws, the tax code, and the federal and state False Claims statutes. Stengle was the lead attorney in the first whistleblower claim awarded by the IRS tax whistleblower's office in which the whistleblower was paid $5.5 million.

**BUZZ:** Tell us how you became interested financial whistle blowing?

**STENGLE:** My interest in qui tam actions in the finance industry in general was piqued when Congress changed federal law in 2009 to provide the United States with some additional protection for the spending of TARP dollars. Up until then, whistle blower suits had been mostly in the health care arena and defense contracts. With that change in 2009, the whistleblower lawyers were given a very clear signal by Congress that it thought the whistleblower mechanism was effective and necessary to address large scale finance industry fraud. Attorneys are taking note, and I personally have seen an explosion in non-pharmaceutical actions.

**BUZZ:** How did you get involved with the appraiser/appraisal aspect of Dodd-Frank?

<span style="color:red">Case ID: 150302491</span>

**STENGLE:** John Ferguson tracked me down through LinkedIn because I had been posting information about how I would never recommend an internal compliance reporting mechanism. He told me about some of his experiences, and the two of us quickly realized that this was a great relationship. John's a very experienced appraiser, and I know my stuff. The two of us just began noodling out the theories and how the appraisal situation could possibly fit into a false claims action.

**BUZZ:** Some of the components of Dodd-Frank go into effect April 1. Appraisers are feeling like they are fighting "city hall". Do you think Dodd-Frank has any teeth?

**STENGLE:** I think the whistleblower portion of the act has teeth, at least right now, because the SEC so badly botched the Madoff situation. The SEC appears to be responsive to whistleblowers, and the folks at the SEC I have worked with have been just incredibly helpful and insightful. Unfortunately, there are many proposed rules that look like they are intent on gutting the whistleblower program, and like other administrative agency processes, the SEC's interest in claims is going to ebb and flow with the political climate. Three years from now, the SEC's interests could be completely different. The program is evolving. We'll have to see.

**BUZZ:** If it is business as usual on April 1 what can appraisers do? Who are the regulators of "customary and reasonable"?

**STENGLE:** Well, I wouldn't rely on Dodd-Frank. If I were an appraiser who wanted to blow the whistle, I would look for an attorney who understands the various avenues open for a whistleblower recovery and is willing to take a very aggressive stance with regard to filing perhaps multiple claims. The False Claims Act is an excellent opportunity; it depends on the facts of the particular case.

**BUZZ:** Does the "whistle blower" component of Dodd-Frank apply to appraisals?

**STENGLE:** It can. It depends on who the whistleblower is blowing the whistle on, and what that potential defendant has been doing with regard to securities.

**BUZZ:** Should appraisers or lenders that want to report a Dodd-Frank violation to the SEC use the SEC website online complaint form or who should they call?

**STENGLE:** OMG, call me, or call John Ferguson before filing anything online. That SEC online website complaint form is a nightmare! Don't even get me started. Call me at 215-367-4314 or email me at lstengle@▮▮▮▮com (mailto:lstengle@▮▮▮▮com). Or, contact John Ferguson at john_ferguson2002@netzero.net (mailto:john_ferguson2002@netzero.net) or (530) 300-2978. Even if I don't take the case, call me anyway. I can give some easy tips that will help someone who is courageous enough to try to file a claim on their own.

**BUZZ:** Are there any monetary rewards associated with the Dodd-Frank and SEC whistle blower program?

**STENGLE:** Yes. Assuming the whistleblower has done his or her job properly, the whistleblower gets a percentage of the government's recovery from a successful investigation of the defendant. Those dollars can be significant.

**BUZZ:** How does the SEC whistle blower program differ from the U.S. Department of Labor whistle blower program?

**STENGLE:** Oh, in several ways. The SEC program offers anonymity, and it's not about individual damages. It's about fraud on the investors and material violation of government securities laws. Plus, the whistleblower, if the claim is successful, gets a percentage of the government's recovery in the SEC program. None of these things are true in the DOL program, to my knowledge.

**BUZZ:** Finally is there any protection for the whistle blower?

**STENGLE:** There is some. The biggest one in the SEC arena is that the whistleblower can maintain anonymity throughout the process. Whistle blowing is tricky business however. It takes forever to get an award, if you get an award, and whistleblowers have been outed, even prosecuted, for creating problems in the government investigation or failing to provide full disclosure and a hundred other things. I would never ever blow the whistle without consulting an attorney. It's just too dangerous.

Case ID: 150302491

**Exhibit E**

Case ID: 150302491

# ZNETZERO® Message Center

**From:** Linda J. Stengle <LStengle@[          ]com>

**To:** "John Ferguson" <john_ferguson2002@netzero.com>

**Sent:** Wed, Mar 23, 2011 11:28 AM

**Subject:** RE: Article worked got a call from a guy

John,

Madsen is going to sign. He is not willing to have you named as a relator, so we are going to have to work this in the form of you getting a percentage of my take on the case.

Madsen, [    ] and I are fussing about some related representation issues - OREA stuff, but the bottom line is we are going to sign him for the SEC claim and for the FCA filings.

Where are we at with the Mann narrative? I have a meeting on that in a few hours.

L


Linda J. Stengle, Esq., CFS
[                        ] PC

1787 Sentry Parkway West
Suite 410 Building 18
Blue Bell, PA 19422
Email: Lstengle@[          ]com
NEW PHONE NO: 215-367-4333
NEW DIRECT LINE: 215-367-4314
NEW FAX: 215-367-4335
Admitted in PA, NJ, NY, and US Tax Court

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain
confidential information belonging to the sender, which is protected by
the attorney-client privilege. The information is intended only for the
use of the individual or entity named above. If you are not the intended
recipient, you are hereby notified that any disclosure, copying,
distribution (electronic or otherwise), forwarding or the taking of any
action in reliance on the contents of this information is strictly
prohibited. If you have received this electronic transmission in error,
please immediately notify us by telephone, facsimile, or e-mail to
LStengle@[          ]com to arrange for return of the electronic
email, attachments, or documents.

-----Original Message-----
From: John Ferguson [mailto:john_ferguson2002@netzero.com]
Sent: Wednesday, March 23, 2011 9:56 AM
To: Linda J. Stengle
Subject: Re: Article worked got a call from a guy

Tell

Sent from my iPhone

On Mar 23, 2011, at 4:07 AM, "Linda J. Stengle"
<LStengle@[          ]com> wrote:

Case ID: 150302491

> It went well. He wants me to woo him at 30% contingency. His other lawyers are only talking an SEC action.
>
> I have to talk to my lead partner about the reduced fee and see what we can do.
>
> L
>
> Sent from my iPhone
>
> On Mar 22, 2011, at 7:08 PM, "John Ferguson" <john_ferguson2002@netzero.com> wrote:
>
>> What happened
>>
>> Sent from my iPhone
>>
>> On Mar 22, 2011, at 6:17 AM, "Linda J. Stengle" <LStengle@       com> wrote:
>>
>>> Sitting in a doctor's office now. Around 12 noon eastern?
>>>
>>> Sent from my iPhone
>>>
>>> On Mar 22, 2011, at 9:13 AM, "John Ferguson" <john_ferguson2002@netzero.com> wrote:
>>>
>>>> What time
>>>>
>>>> Sent from my iPhone
>>>>
>>>> On Mar 22, 2011, at 3:12 AM, "Linda J. Stengle" <LStengle@       com> wrote:
>>>>
>>>>> Okay. Will call him later today.
>>>>>
>>>>> L
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>> On Mar 21, 2011, at 7:09 PM, "John Ferguson" <john_ferguson2002@netzero.com> wrote:
>>>>>
>>>>>> Call me if you can 530-300-2978
>>>>>>
>>>>>> I Spoke with Bob Madson (appraiser) he is looking for an attorney

>>>>>> to file a claim against Landsafe which is the AMC that bank
>>>>>> america owns. This could be huge. call him or we can do a conf
>>>>>> call tomorrow. His number is 530-477-1679
>>>>>>
>>>>>
>>>
>

Case ID: 150302491

**Exhibit F**

Case ID: 150302491

# ⊠NETZERO® Message Center

**From:** Linda J. Stengle <LStengle@[redacted]com>

**To:** "John Ferguson" <john_ferguson2002@netzero.com>

**Sent:** Wed, Mar 23, 2011 11:28 AM

**Subject:** RE: Article worked got a call from a guy

---

John,

Madsen is going to sign. He is not willing to have you named as a relator, so we are going to have to work this in the form of you getting a percentage of my take on the case.

Madsen, [redacted] and I are fussing about some related representation issues - OREA stuff, but the bottom line is we are going to sign him for the SEC claim and for the FCA filings.

Where are we at with the Mann narrative? I have a meeting on that in a few hours.

L


Linda J. Stengle, Esq., CFS
[redacted] ▌[redacted] PC

1787 Sentry Parkway West
Suite 410 Building 18
Blue Bell, PA 19422
Email: Lstengle@[redacted]com
NEW PHONE NO: 215-367-4333
NEW DIRECT LINE: 215-367-4314
NEW FAX: 215-367-4335
Admitted in PA, NJ, NY, and US Tax Court

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain confidential information belonging to the sender, which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution (electronic or otherwise), forwarding or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this electronic transmission in error, please immediately notify us by telephone, facsimile, or e-mail to LStengle@[redacted]com to arrange for return of the electronic email, attachments, or documents.

-----Original Message-----
From: John Ferguson [mailto:john_ferguson2002@netzero.com]
Sent: Wednesday, March 23, 2011 9:56 AM
To: Linda J. Stengle
Subject: Re: Article worked got a call from a guy

Tell

Sent from my iPhone

On Mar 23, 2011, at 4:07 AM, "Linda J. Stengle"
<LStengle@[redacted]com> wrote:

Case ID: 150302491

> It went well. He wants me to woo him at 30% contingency. His other
lawyers are only talking an SEC action.
>
> I have to talk to my lead partner about the reduced fee and see what
we can do.
>
> L
>
> Sent from my iPhone
>
> On Mar 22, 2011, at 7:08 PM, "John Ferguson"
<john_ferguson2002@netzero.com> wrote:
>
>> What happened
>>
>> Sent from my iPhone
>>
>> On Mar 22, 2011, at 6:17 AM, "Linda J. Stengle"
<LStengle@▮▮▮▮▮▮▮▮com> wrote:
>>
>>> Sitting in a doctor's office now. Around 12 noon eastern?
>>>
>>> Sent from my iPhone
>>>
>>> On Mar 22, 2011, at 9:13 AM, "John Ferguson"
<john_ferguson2002@netzero.com> wrote:
>>>
>>>> What time
>>>>
>>>> Sent from my iPhone
>>>>
>>>> On Mar 22, 2011, at 3:12 AM, "Linda J. Stengle"
<LStengle@▮▮▮▮▮▮▮▮com> wrote:
>>>>
>>>>> Okay. Will call him later today.
>>>>>
>>>>> L
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>> On Mar 21, 2011, at 7:09 PM, "John Ferguson"
<john_ferguson2002@netzero.com> wrote:
>>>>>
>>>>>> Call me if you can 530-300-2978
>>>>>>
>>>>>> I Spoke with Bob Madson (appraiser) he is looking for an
attorney
>>>>>> to file a claim against Landsafe which is the AMC that bank
>>>>>> america owns. This could be huge. call him or we can do a conf
>>>>>> call tomorrow. His number is 530-477-1679
>>>>>>
>>>>>
>>>
>

Case ID: 150302491

Subject: RE: Article worked got a call from a guy

I'm feeling a bit squeamish about this deal...


---------- Original Message ----------
From: "Linda J. Stengle" <LStengle@████████com>
To: "John Ferguson" <john_ferguson2002@netzero.com>
Subject: RE: Article worked got a call from a guy
Date: Wed, 23 Mar 2011 14:28:39 -0400

John,

Madsen is going to sign.  He is not willing to have you named as a relator. so we are going to have to work this in the form of you getting a percentage of my take on the case.

Madsen, ████ and I are fussing about some related representation issues - OREA stuff, but the bottom line is we are going to sign him for the SEC claim and for the FCA filings.

Where are we at with the Mann narrative?  I have a meeting on that in a few hours.

L


Linda J. Stengle, Esq., CFS
████████████ PC

1787 Sentry Parkway West
Suite 410 Building 18
Blue Bell, PA 19422
Email: Lstengle@██████████com
NEW PHONE NO: 215-367-4333
NEW DIRECT LINE: 215-367-4314
NEW FAX: 215-367-4335
Admitted in PA, NJ, NY, and US Tax Court

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain confidential information belonging to the sender, which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution (electronic or otherwise), forwarding or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this electronic transmission in error, please immediately notify us by telephone, facsimile, or e-mail to LStengle@████████com to arrange for return of the electronic email, attachments, or documents.

-----Original Message-----
From: John Ferguson [mailto:john_ferguson2002@netzero.com]
Sent: Wednesday, March 23, 2011 9:56 AM
To: Linda J. Stengle
Subject: Re: Article worked got a call from a guy

Case ID: 150302491

Tell

Sent from my iPhone

On Mar 23, 2011, at 4:07 AM, "Linda J. Stengle"
<LStengle@███████████com> wrote:

> It went well.  He wants me to woo him at 30% contingency.  His other
lawyers are only talking an SEC action.
>
> I have to talk to my lead partner about the reduced fee and see what
we can do.
>
> L
>
> Sent from my iPhone
>
> On Mar 22, 2011, at 7:08 PM, "John Ferguson"
<john_ferguson2002@netzero.com> wrote:
>
>> What happened
>>
>> Sent from my iPhone
>>
>> On Mar 22, 2011, at 6:17 AM, "Linda J. Stengle"
<LStengle@███████████com> wrote:
>>
>>> Sitting in a doctor's office now.  Around 12 noon eastern?
>>>
>>> Sent from my iPhone
>>>
>>> On Mar 22, 2011, at 9:13 AM, "John Ferguson"
<john_ferguson2002@netzero.com> wrote:
>>>
>>>> What time
>>>>
>>>> Sent from my iPhone
>>>>
>>>> On Mar 22, 2011, at 3:12 AM, "Linda J. Stengle"
<LStengle@███████████> wrote:
>>>>
>>>>> Okay.  Will call him later today.
>>>>>
>>>>> L
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>> On Mar 21, 2011, at 7:09 PM, "John Ferguson"
<john_ferguson2002@netzero.com> wrote:
>>>>>
>>>>>> Call me if you can 530-300-2978

3

Case ID: 150302491

>>>>>>
>>>>>> I Spoke with Bob Madson (appraiser) he is looking for an attorney

>>>>>> to file a claim against Landsafe which is the AMC that bank
>>>>>> america owns. This could be huge. call him or we can do a conf
>>>>>> call tomorrow. His number is 530-477-1679
>>>>>>
>>>>>
>>>
>

Case ID: 150302491

**Exhibit G**

Case ID: 150302491

# ⊠NETZERO® Message Center

**From:** Linda J. Stengle <LStengle@■■■■■■■■com>

**To:** "John Ferguson" <john_ferguson2002@netzero.com>

**Sent:** Tue, Mar 29, 2011 08:37 AM

**Subject:** RE: Article worked got a call from a guy

Says he is signing and sending today.

L


Linda J. Stengle, Esq., CFS
■■■■■■■■■ PC

1787 Sentry Parkway West
Suite 410 Building 18
Blue Bell, PA 19422
Email: Lstengle@■■■■■■■■com
NEW PHONE NO: 215-367-4333
NEW DIRECT LINE: 215-367-4314
NEW FAX: 215-367-4335
Admitted in PA, NJ, NY, and US Tax Court

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain
confidential information belonging to the sender, which is protected by
the attorney-client privilege. The information is intended only for the
use of the individual or entity named above. If you are not the intended
recipient, you are hereby notified that any disclosure, copying,
distribution (electronic or otherwise), forwarding or the taking of any
action in reliance on the contents of this information is strictly
prohibited. If you have received this electronic transmission in error,
please immediately notify us by telephone, facsimile, or e-mail to
LStengle@■■■■■■■■com to arrange for return of the electronic
email, attachments, or documents.

-----Original Message-----
From: John Ferguson [mailto:john_ferguson2002@netzero.com]
Sent: Tuesday, March 29, 2011 11:33 AM
To: Linda J. Stengle
Subject: RE: Article worked got a call from a guy

Did you get Madsen signed up yet?


————— Original Message —————
From: "Linda J. Stengle" <LStengle@■■■■■■■■com>
To: "John Ferguson" <john_ferguson2002@netzero.com>
Subject: RE: Article worked got a call from a guy
Date: Mon, 28 Mar 2011 15:22:29 -0400

I don't have an attachment, and I don't really remember an attachment,
but that could just be me.

When I talked to ■■■ we didn't look at any documents. I had called
the guy and talked with him for about 45 minutes. He had also sent some
emails.

There is no question you and I discussed the matter though. I am happy
to have this email serve as confirmation of that, if you are worried

Case ID: 150302491

that I will get some sort of amnesia....

:)

L


Linda J. Stengle, Esq., CFS
████████ █████████████ PC

1787 Sentry Parkway West
Suite 410 Building 18
Blue Bell, PA 19422
Email: Lstengle@████████████com
NEW PHONE NO: 215-367-4333
NEW DIRECT LINE: 215-367-4314
NEW FAX: 215-367-4335
Admitted in PA, NJ, NY, and US Tax Court

Electronic Mail Confidentiality Notice
This electronic mail message and all attachments may contain
confidential information belonging to the sender, which is protected by
the attorney-client privilege. The information is intended only for the
use of the individual or entity named above. If you are not the intended
recipient, you are hereby notified that any disclosure, copying,
distribution (electronic or otherwise), forwarding or the taking of any
action in reliance on the contents of this information is strictly
prohibited. If you have received this electronic transmission in error,
please immediately notify us by telephone, facsimile, or e-mail to
LStengle@████████████com to arrange for return of the electronic
email, attachments, or documents.

-----Original Message-----
From: John Ferguson [mailto:john_ferguson2002@netzero.com]
Sent: Monday, March 28, 2011 2:45 PM
To: Linda J. Stengle
Subject: Re: Article worked got a call from a guy

I thot I did it as an attachment not sure

Sent from my iPhone

On Mar 28, 2011, at 8:44 AM, "Linda J. Stengle"
<LStengle@████████████com> wrote:

> This email chain?
>
> L
>
>
> Linda J. Stengle, Esq., CFS
>████████████████████ PC
>
> 1787 Sentry Parkway West
> Suite 410 Building 18
> Blue Bell, PA 19422
> Email: Lstengle@████████████com
> NEW PHONE NO: 215-367-4333
> NEW DIRECT LINE: 215-367-4314
> NEW FAX: 215-367-4335
> Admitted in PA, NJ, NY, and US Tax Court
>
> Electronic Mail Confidentiality Notice This electronic mail message
> and all attachments may contain confidential information belonging to
> the sender, which is protected by the attorney-client privilege. The

Case ID: 150302491

**Exhibit H**

Case ID: 150302491



...y Furniture, Mattress or Similar Items with PolyFoam?
...wsuit Info

**DealB%k**                                                    SUBSCRIBE

# A Second Bank of America Whistle-Blower Is Set to Get $56 Million



Bank of America reached a $16.65 billion civil settlement with the federal government.
STAN HONDA / AGENCE FRANCE-PRESSE — GETTY IMAGES

By MATTHEW GOLDSTEIN
DECEMBER 18, 2014

Robert Madsen, one of four whistle-blowers in the federal government's $16.65 billion civil settlement with Bank of America, said keeping secret his cooperation with federal prosecutors for nearly four years had not been easy.

"It's not a fun and pleasant experience," said Mr. Madsen, 47, a former employee of LandSafe, a property appraisal company that is a subsidiary of Bank of America. "You are under a court ordered seal and you have all this stress."

Case ID: 150302491

But for his efforts, Mr. Madsen is being rewarded.

Mr. Madsen said federal prosecutors would pay him $56 million, out of the $16.65 billion Bank of America 'agreed to pay in August to settle claims arising from the investigation into the bank's mortgage lending and mortgage securitization business. The specific terms of Mr. Madsen's settlement with the federal government remain sealed.

In an interview on Thursday, Mr. Madsen said he could not talk to many people about his behind-the-scenes cooperation with federal prosecutors, which involved turning over thousands of pages of documents and sitting for many interviews with an agent for the Federal Bureau of Investigation.

And, he said, when the process of working with federal authorities began, there was no guarantee anything would come of his claim that Bank of America systematically overvalued distressed residential properties held on its balance sheet, much of it after the 2008 financial crisis.

In a confidential complaint that Mr. Madsen filed in federal court in Manhattan against Bank of America in 2011, the appraiser said the bank deliberately used "improper appraisal practices" that overstated the value of the homes backing Bank of America's portfolio of nonperforming loans by $6.6 billion. The 220-page legal filing said the improper appraisals at the bank's LandSafe subsidiary continued until at least 2011.

"I did not go into this with the mindset that I would get some money," said Mr. Madsen, a northern California resident.

Mr. Madsen said he filed the "qui tam" action under the federal False Claims Act, which is intended to help protect jobs of potential whistle-blowers who assert that they have claims of fraud against the federal government. Mr. Madsen's complaint against Bank of America was unsealed by a federal judge on Dec. 9.

The government's whistle-blower settlement with Mr. Madsen is comparable to the $57.6 million payout Edward O'Donnell, a former executive with Countrywide Financial, is receiving for his role in contributing to case prosecutors in New York were building against Bank of America. Mr. O'Donnell provided prosecutors with evidence that Countrywide, which Bank of America acquired in early 2008, were more interested in churning out mortgage despite growing signs of problems with quality of those loans.

Bank of America acquired LandSafe, where Mr. Madsen had worked, when it bought Countrywide Financial in 2008.

Case ID: 150302491

Lawrence Grayson, a spokesman for Bank of America, said on Thursday that the bank did not comment on "unfounded assertions." He reiterated what he said on Wednesday about Mr. O'Donnell's settlement with the federal government, which is that the bank had "fully resolved" the matter.

Neither the involvement of Mr. O'Donnell nor Mr. Madsen in providing authorities with information that helped forge the $16.65 billion settlement were known before this week.

Two other whistle-blowers were also credited by the federal government with providing useful information during the investigation in the civil settlement agreement between Bank of American and prosecutors. Their identities are not yet public.

Mr. Madsen's cooperation is particularly interesting because the misconduct he cites in his lawsuit occurred mostly after the financial crisis — he worked at LandSafe from 2007 to early 2013 — and is not directly tied to sale of mortgage-backed bonds.

His lawsuit said the "systemic misrepresentation" in property appraisals and valuations made the bank "appear to be more profitable and financially stable" than it was at the time.

Mr. Madsen, who spoke during a phone interview arranged by a public relations firm, said he did not believe that the conduct he saw at the bank's residential property appraisal division was criminal. He said many of the problems he saw were "endemic to the entire appraisal industry."

He said he intended to use some of the money from the settlement to help fund a new appraisal firm he co-founded two years ago called ValuationAnalytix. "I am intending to put some of this money back into this business," said Mr. Madsen. "This is an industry I used to love."

Robert Madsen Whistle-Blower Case

**5 COMMENTS**

**Most Popular on NYTimes.com**

Case ID: 150302491

**Exhibit I**

Case ID: 150302491

# The New York Times

NYT NOW

# Whistle-Blower on Countrywide Mortgage Misdeeds to Get $57 Million

By Matthew Goldstein

December 17, 2014 1:15 pm

Updated, 4:59 p.m. | A former Countrywide Financial executive who became a whistle-blower is collecting more than $57 million for helping federal prosecutors force Bank of America to pay a record $16.65 billion penalty in connection with its role in churning out shoddy mortgage and related securities before the financial crisis.

Edward O'Donnell reached an agreement last week with the government that enables him to collect part of the settlement that Bank of America agreed to pay in August in a deal with federal prosecutors and a number of state attorneys general, according to a court filing.

The payment to Mr. O'Donnell arises from a federal lawsuit he filed under the False Claims Act earlier this year and which Preet Bharara, the United States attorney for the Southern District of New York, joined and used as the basis for pressing Bank of America to reach a deal.

"In my opinion, Edward O'Donnell is the person most responsible for bolstering the bank settlements and holding Wall Street accountable," said David G. Wasinger, the lawyer for Mr. O'Donnell, who worked from 2003 to 2009 at Countrywide, the once-dominant mortgage lender that Bank of America acquired in early 2008.

The $57 million payout is one of the larger whistle-blower awards paid to an individual, but it is by no means the largest.

Case ID: 150302491

The amount is little more than half the $104 million the Internal Revenue Service paid in 2012 to a former UBS banker, Bradley Birkenfeld, who spent two and a half years in prison for helping his wealthy American client avoid paying taxes. Mr. Birkenfeld was rewarded by the I.R.S. for providing information about the inner workings of the bank's tax avoidance scheme.

Mr. O'Donnell's role in providing ammunition to the federal prosecutors who pursued the so-called global settlement with Bank of America was not previously known. It only became public in a court document filed on Monday. But this is not the first time Mr. O'Donnell has served as a critical whistle-blower in helping the government pursue claims against Bank of America and, more specifically, Countrywide.

An earlier false-claims lawsuit filed by Mr. O'Donnell was instrumental in Mr. Bharara's pursuit of a civil fraud claim against Bank of America and a former Countrywide official for selling shoddy mortgages. The lawsuit centered on a program at Countrywide nicknamed the hustle, which rewarded employees for producing more loans regardless of the quality.

In July, a federal judge ordered Bank of America to pay a $1.27 billion penalty in that case. The former Countrywide executive who faced civil action in that lawsuit, Rebecca Mairone, was ordered to pay a $1 million fine for her role in directing the program.

Mr. Wasinger said a financial agreement with the federal government concerning Mr. O'Donnell's whistle-blower role in the hustle case had yet to be decided. Federal law may limit his potential reward to a few million dollars.

Mr. O'Donnell was a key witness for the government at the hustle trial in 2013.

Marc L. Mukasey, a lawyer for Ms. Mairone, the lone Countrywide official to face civil accusations in the case, said he was surprised to learn about Mr. O'Donnell's additional role as a whistle-blower. "It turns out that Ed O'Donnell

Case ID: 150302491

had even more motivation to bend the facts, rewrite history and throw his colleagues under the bus," Mr. Mukasey said.

Until a few weeks ago, Mr. O'Donnell had been a vice president at Fannie Mae, Mr. Wasinger said. At Countrywide, Mr. O'Donnell, who resides in Pennsylvania, had also been a vice president.

A recently unsealed copy of the civil lawsuit that Mr. O'Donnell filed in June said that he had provided "material information" to federal prosecutors before he filed his action.

The lawsuit provided information about activity in Countrywide's consumer markets division that was similar to what he said had taken place in the hustle program. Mr. O'Donnell's lawsuit said the division "continued to push loan production to record levels in spite of clear signals that there were problems with early loan repayment performance."

Mr. O'Donnell may not be the only whistle-blower who stands to collect a percentage of Bank of America's payout to the federal government. The United States settlement with Bank of America mentions three other false-claims lawsuits brought against the bank. The names of those whistle-blowers, like Mr. O'Donnell's, were not identified in the settlement agreement.

The government's agreement with Mr. O'Donnell arises from the portion of the global settlement that Bank of America reached with federal prosecutors and California, Delaware, Illinois, Kentucky, Maryland and New York. It values that portion of the settlement at $350 million and said Mr. O'Donnell was entitled to a 16 percent share of it.

In addition, Mr. O'Donnell is collecting a separate $1.6 million payment from Bank of America, according to the settlement.

"This matter has been fully resolved, and we won't comment on unfounded assertions," said Lawrence Grayson, a Bank of America

Case ID: 150302491

**spokesman, referring to Mr. O'Donnell's lawsuit.**

A version of this article appears in print on 12/18/2014, on page B4 of the NewYork edition with the headline: Whistle-Blower on Mortgage Misdeeds to Get $57 Million.

---

© 2015 The New York Times Company

Case ID: 150302491

**Exhibit J**

Case ID: 150302491

# The New York Times

# Whistle-Blower Payouts Approach $170 Million in Bank of America Case

By Matthew Goldstein

December 19, 2014 1:34 pm

Updated, 2:37 p.m. | The total payouts to whistle-blowers in the federal government's $16.65 billion settlement with Bank of America over its mortgage business may approach $170 million.

Edward O'Donnell, a former executive at Countrywide Financial, and Robert Madsen, a former property appraiser for the bank already have been identified as two of the whistle-blowers that federal prosecutors gave credit to in the settlement agreement with Bank of America.

The other two whistle-blowers entitled to a share of the settlement dollars being paid out by Bank of America are Shareef Abdou, an executive in the bank's operations group, and the firm Mortgage Now, a New Jersey mortgage lender, according to court filings.

The filings did not disclose the value of the settlement payouts, but the whistle-blowers, all of whom filed complaints under the Federal False Claims Act, are collecting payments equal to 16 percent to 17 percent of specific portions of the $16.65 billion, according to court filings and people briefed on the matter but not authorized to speak publicly.

Using that formula, Mr. Abdou stands to collect a payout of $48 million for providing information to federal prosecutors.

███ Mahany, a lawyer for Mr. Abdou, declined to comment on his client's settlement with the government. He said his client was currently on

Case ID: 150302491

leave from his position with Bank of America.

Clifford Marshall, a lawyer for Mortgage Now who also worked with lawyers from Milberg, said his client would receive $8.5 million, based on a 17 percent share of the settlement amount.

The payout to Mr. Abdou is slightly less than the $57.6 million being paid to Mr. O'Donnell and the $56 million that Mr. Madsen said he would receive.

In the payout calculation, the portions of the settlement that prosecutors gave Mr. Abdou and Mortgage Now credit for are smaller than the ones assigned to Mr. O'Donnell and Mr. Madsen.

The settlements with the whistle-blowers are referenced in the $16.65 billion civil settlement agreement between the Justice Department and Bank of America but the names were withheld, although Mortgage Now's name inadvertently appeared in one of the settlement papers. The combined $169 million in whistle-blower payouts would make it one of the larger settlements the federal government has agreed to in any single case.

Each of the four whistle-blowers had brought a "qui tam" action under the federal False Claims Act. The whistle-blowers then began working with federal and state authorities, who were investigating allegations that Bank of America, and companies it acquired like Countrywide, had churned out billions of dollars of shoddy mortgages and related securities in the run-up to the financial crisis.

A qui tam action is intended to help protect jobs of potential whistle-blowers who assert that they have claims of fraud against the federal government.

The complaints filed by the four whistle-blowers were recently unsealed by federal judges in the wake of the bank's settlement. A bank spokesman has said the matter is resolved and the bank will not comment further.

Case ID: 150302491

© 2015 The New York Times Company

Case ID: 150302491

**Exhibit K**

Case ID: 150302491

# LinkedIn

**John Ferguson** has sent you a message.

**Date:** 11/08/2010

**Subject:** Let me know what you think.

Good Morning Linda,

I'm working on partnering with an audit firm located in Florida, together we plan on representing home owners that are facing or have already lost their homes to foreclosure. Our experience is that 100 percent of the loan packages, especially the appraisal, are flawed. We will audit the file and request that the lender either walk away from the loan or modify it to our satisfaction. My goal is to partner with one or two law firms in every state.

John

View/reply to this message

Don't want to receive e-mail notifications? Adjust your message settings.
© 2010, LinkedIn Corporation

&lt;Linda Stengle Road map to Mortgage Mess.docx&gt;

&lt;Bankunited fdic demand poor appraisal review.pdf&gt;

=

**Linda Stengle Road map to Mortgage Mess.doc**
25K

Case ID: 150302491

From: John Ferguson <john_ferguson2002@netzero.com>
To: lstengle@aol.com
Sent: Mon, Nov 8, 2010 1:52 pm
Subject: Re: Let me know what you think.

Indymac, WAMU, Bankunited, Countrywide, Wellsfargo, and every bank that has failed over the past two years. Almost all due to poor lending practice meaning fraud and lax underwriting. It would be like shooting fish in a barrel.

———— Original Message ————
From: lstengle@aol.com
To: john_ferguson2002@netzero.com
Subject: Re: Let me know what you think.
Date: Mon, 08 Nov 2010 13:48:48 -0500

How big are the lenders?  How many lenders are there?

L

————Original Message————
From: John Ferguson <john_ferguson2002@netzero.com>
To: lstengle@aol.com
Sent: Mon, Nov 8, 2010 12:51 pm
Subject: Re: Let me know what you think.

Okay, I get the certification thing, can I officially make a claim with you on ALL of the lenders?

———— Original Message ————
From: lstengle@aol.com
To: john_ferguson2002@netzero.net
Subject: Re: Let me know what you think.
Date: Mon, 08 Nov 2010 12:10:42 -0500

Hi John,

I was thinking about you just last week.  We think the way to make a FERA claim/whistleblower action work is to target a large bank or lender that signs off on the certifications to Fannie Mae/Freddie Mac when the bank or lender knows that the documentation is not in place or is fraudulent.  If you come across a pattern with a particular lender violating government certifications somehow, this would be worth pursuing in our firm.

If you want to proceed on behalf of an individual home owner, you probably want a property/real estate attorney in each state.  If you want large scale misconduct, in the area of false certifications, you want a specialized false claims act firm.

Does that help or just confuse things?

L

————Original Message————
* From: John Ferguson via LinkedIn <member@linkedin.com>
To: Linda Stengle <lstengle@aol.com>
Sent: Mon, Nov 8, 2010 12:02 pm
Subject: Let me know what you think.

Case ID: 150302491

From: lstengle@aol.com
To: john_ferguson2002@netzero.com
Subject: Re: Let me know what you think.
Date: Tue, 16 Nov 2010 13:36:07 -0500

Nopes. :)

Another case.

We want to make sure we understand it clearly before we start talking to prosecutors.

L


——Original Message——
From: John Ferguson <john_ferguson2002@netzero.com>
To: Linda Stengle <lstengle@aol.com>
Sent: Wed, Nov 10, 2010 9:30 am
Subject: Re: Let me know what you think.

Meeting with them about this issue?

Sent from my iPhone

On Nov 10, 2010, at 1:41 AM, Linda Stengle <lstengle@aol.com> wrote:

> Meeting with doj today.  Will respond tomorrow.
> L
>
> Sent from my iPhone
>
> On Nov 9, 2010, at 4:28 PM, "John Ferguson" <john_ferguson2002@netzero.com>
> wrote:
>
>> Attached please find word doc road map, and pdf files related to
>> Bankunited suits.
>>
>> ———— Original Message ————
>> From: lstengle@aol.com
>> To: john_ferguson2002@netzero.com
>> Subject: Re: Let me know what you think.
>> Date: Tue, 09 Nov 2010 08:22:18 -0500
>>
>> Can you road map this for me?  What were they supposed to do, and what did they fail
>> to do?
>>
>> I want to run this by my boss.
>>
>> L
>>
>>
>> ——Original Message——

Case ID: 150302491

**Exhibit L**

Case ID: 150302491

I will use Bankuinited as an example but it applies to ALL lenders that participated in the 2002-2007 mortgage mess and how it related to the selling of loans.

First, let me tell you I was looking to get off of main-street in 2005, I was selling real estate, training appraisers, doing appraisals myself, and working with land developers at the time. Because I saw a very steep decline in traffic at my listing, and because I saw listing DOM extending I could tell that the markets were changing. I got a call from my boss at Bkunited in July of 2005 and I started working for them as an in-house appraisal reviewer in August 2005. Between August and December 2005 I saw a pattern of a decline in lending standards both in the Underwriting of Credit and Appraisals.

Bankunited was building a mortgage machine, a platform to rapidly produce as many mortgages as wall-street could buy. Historically Bkunited was a conservative lender that typically would portfolio most of its loans. In order to compete in this market they had to be able to crank out loans and to do this they had to turn the loans around quickly and with little oversight. The bank hired Robert Green as its head of mortgage lending who in turn brought in my Boss Bob Brecht, as Chief Appraiser, a long time friend. Bob G came from the subprime lending world working for Great Western bank, The Money Store, and just prior to Bkunited Greenpoint mortgage. Bob Brecht had never worked for a bank in his entire career which was perfect for a bank that didn't want to slow down the lending mill. In 2002, they hired Felix Garcia as their EVP of Risk Management, Felix had just lost his job at Hamilton bank due to the FDIC takeover, apparently they were making very risky loans and Felix was the head of their lending department. I worked for the Risk Management department but because I was in California and the banks corporate headquarters was in Florida, I was given and office in the California loan production office in Walnut Creek.

At first, things seemed to work normally and the loans didn't appear to be too bad. As time went on I noticed a decline in the Appraisal quality and because, at first, I was given the entire loan file I could see that the credit was just awful. I was finding lawsuits related to the property, multiple appraisals by the same appraiser with different values; every time I found a file like that they always used the appraisal with the higher value so they could make the loan. I have tons of examples of appraisal fraud but for the sake of this brief roadmap I will move on.

Basically the bank was building this huge mortgage machine to crank out loans that could be sold to Fannie and Freddie. Bankunited had a huge percentage of no doc and low doc loans that eventually took it down. I started warning Sr. Management of its path to destruction in December of 2005 and my complaints about the sky falling got louder and more regular as time went on. The bank asked me to do a market study for the possible expansion into the San Diego market in 2006 which I completed in November 2006. In my report I warned the bank that ALL of the markets were in a state of decline and that the San Diego market along with other major markets would decline at least 30% over the next 3 years. I have my report still. The bank was fully aware of what was happening nationwide yet they continued and even increased their lending and selling to the secondary markets. The bank knew it's loans were having issues because my boss told me that the bank was getting more repurchase requests from the investors, meaning that Fannie and Freddie were sending loans back to the bank because they had issues and didn't fit the investors criteria. After the bank was closed I know that Fannie Mae made the new

Bankunited, FDIC took over BKunited in 2009, repurchase a lot of its loans. Bankunited is currently in the bankruptcy court in Florida, has a class action suit against it, and the Board and Sr. management is being sued for poor risk management practices. See FDIC suit.

This is a brief synopsis of what Bankunited did and I know it's exactly how most if not all of the mortgage lenders operated. It was a matter of competition, in order to get the business from the mortgage brokers the lenders had to give the quickest turnaround time and require the least amount of paperwork possible. The appraisal in most cases was the only document that gave the bank the ability to detect fraud and determine how safe the loan was but the bank decided to quash any attempts to use that tool because it killed too many deals and it was a time eater. A lot of this is provable via SEC filings, and regulator PCA's and other sources i.e., class action suits etc. Please feel free to call me if you have any questions. 530-300-2978 cell

John

Case ID: 150302491

# EXHIBIT 3

# IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

ROBERT MADSEN

vs.

BRIAN P KENNEY ESQ

NO. 2016-26797

Case# 2016-26797-0 Docketed at Montgomery County Prothonotary on 11/08/2016 2:57 PM, Fee = $270.00

## PRAECIPE FOR SUMMONS

To the Prothonotary:

    Issue Summons in Civil Action in the above case.

ORIGINAL SIGNATURE RETAINED BY THE FILING PARTY

Signature

DAVID KRAUT, ESQ.

Filing Party

17637

ID Number

Date    11/08/2016

KRAUT HARRIS PC

Firm Name

5 VALLEY SQUARE , SUITE 120

Address

BLUE BELL , PA 19422

(215) 542-4900

Phone

\* \* \* \* \* \* \* \* \*

TO:    Defendant(s)

    You are notified that the Plaintiff(s) has / have commenced an action against you.



Prothonotary, Montgomery County

Date:   11/08/2016          By:   Barry Silver

Clerk / Deputy

Addresses must be included for all parties.

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

ROBERT MADSEN

vs.

BRIAN P KENNEY ESQ

NO. 2016-26797

## CIVIL COVER SHEET

State Rule 205.5 requires this form be attached to any document <u>commencing an action</u> in the Montgomery County Court of Common Pleas. The information provided herein is used solely as an aid in tracking cases in the court system. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

Name of Plaintiff/Appellant's Attorney: DAVID KRAUT, Esq., ID: 17637

Self-Represented (Pro Se) Litigant ☐

**Class Action Suit** ☐ Yes ☒ No

**MDJ Appeal** ☐ Yes ☒ No    **Money Damages Requested** ☒

**Commencement of Action:**    **Amount in Controversy:**

Writ of Summons    More than $50,000

## Case Type and Code

Professional Liability:

Legal

**Other:**

Case# 2016-26797-0 Docketed at Montgomery County Prothonotary on 11/08/2016 2:57 PM, Fee = $270.00

Case# 2016-26797-0 Docketed at Montgomery County Prothonotary on 11/08/2016 2:57 PM, Fee = $270.00

**KRAUT HARRIS, P.C.**
David Kraut, Esquire
Pa. Id. No. 17637
5 Valley Square, Suite 120
Blue Bell, PA 19422
(215) 542-4900 Telephone                    *Attorney for Plaintiff*
(215) 542-0199 Facsimile

---

| | |
|---|---|
| ROBERT MADSEN | COURT OF COMMON PLEAS |
| 10125 Coyote Ridge Court | MONTGOMERY COUNTY, PA |
| Auburn, CA 95602 | |
| | Case No. |
| vs. | |
| BRIAN P. KENNEY, Esquire 1787 | |
| Sentry Parkway West Building 18, | |
| Suite 410 | |
| Blue Bell, PA 19422 | |
| and | |
| KENNEY & McCAFFERTY, P.C. | |
| 1787 Sentry Parkway West | |
| Building 18, Suite 410 | |
| Blue Bell, PA 19422 | |

---

## PRAECIPE TO ISSUE WRIT OF SUMMONS

TO:     Prothonotary

Kindly issue a Summons in Civil Action in the above case.

**KRAUT HARRIS, P.C.**

David Kraut, Esquire
*Attorney for Plaintiff*

Dated: 11-8-2016

Case# 2016-26797-0 Docketed at Montgomery County Prothonotary on 11/08/2016 2:57 PM, Fee = $270.00

## WRIT

To:    BRIAN P. KENNEY, Esquire
1787 Sentry Parkway West
Building 18, Suite 410
Blue Bell, PA 19422

KENNEY & McCAFFERTY, P.C.
1787 Sentry Parkway West
Building 18, Suite 410
Blue Bell, PA 19422

YOU ARE NOTIFIED THAT PLAINTIFF HAS COMMENCED AN ACTION
AGAINST YOU.

SEAL

_____
Prothonotary

Date:                    By:_____
                                 Clerk / Deputy